Argued January 18, reversed and judgment entered June 12, 1923.

# DAVIS *v.* PAYNE.

(216 Pac. 195.)

**Negligence—No Liability Under Federal Employers' Liability Act, Where Employee's Act is Sole Cause of Injury.**

1. Though, under federal Employers' Liability Act (U. S. Comp. Stats., §§ 8657–8665), contributory negligence of injured employee will not defeat the employers' liability, but only reduce recovery, there is no liability, where there was no contributing causal negligence of the master, or any agent or other employee of it, but the injured employee's act was the sole cause.

**Master and Servant—Form of Right of Track Order not Contributory to Accident.**

2. Though south-bound train No. 231, of which plaintiff was engineer, would pass from O. to C., but not to B., on a branch line beyond C., while north-bound train No. 234 would come from B. to C., and then to O., the form of right of track order: "No. 234 has right over 231, B. to O.," given plaintiff, even if a technical violation of rule, because not reading "C. to O.," did not contribute to the trains' collision on the single track between O. and C., plaintiff's admitted knowledge of, and familiarity with, the lines and stations involved, precluding reasonable inference that he was, or could be, misled by the order.

**Master and Servant—Semaphore Signal Gave Train No Right to Proceed Against Right of Track Order.**

3. As, under the standard rules, the written order, transferring to another train right of track from C. to O. over the train of which plaintiff was engineer, could be revoked only by a subsequent order, the dropping of the semaphore bar by the operator, on plaintiff arriving at O. and calling for train order semaphore signal, gave him no right to proceed to C., but only informed him that there was no order there for his train.

**Master and Servant—Engineer Without Right to Start on Conductor's Signal in Violation of Train Order.**

4. The engineer of a train, having a train order transferring to another train right of track from C. to O., had no right to start his train from O. to C. on signal of the conductor; his duty, under standard rules, in all cases, not to start his train in violation of a train order, being superior to his duty to obey the conductor's starting signal.

**Master and Servant—No Inference of Negligence in Giving Train Right of Track Order, Instead of Meet or Wait Order.**

5. In the absence of evidence, it cannot be inferred that the train-dispatcher was negligent in giving a train crew a right of track order, transferring to another train the right of way between two points, instead of giving a meet or wait order, the rules author-

izing an order in any one of the three forms, and each having a well-defined and perfectly understood effect and meaning.

**Master and Servant—No Duty of Train-dispatcher to Give Right of Track Order to Others Than Train Crews.**

6. Where plaintiff engineer, two hours before arriving with his train at O., bound for C., was given a right of track order, transferring right of track, from C. to O., to a train coming to O. from beyond C., there was no duty of the train-dispatcher to send a copy of the order to the operator at O., to be there handed plaintiff; the standard rules requiring such an order to be sent only to the conductor and engineer of the crews affected, though in case of a meet or wait order they require a copy to be sent to the operator at the meeting or waiting point.

**Master and Servant—Direction to Engineer to Follow a Train Beyond a Certain Station not Shown by Evidence.**

7. Evidence that plaintiff, engineer of a train bound for O. and from there to C., four miles beyond, and who had at a prior station been given an order transferring right of track from C. to O. to a train coming from beyond C. to O., on arriving at W., half a mile from O., called up the dispatcher and was told by him to wait there till a fast train, bound for C. by way of O., passed, does not show any direction to plaintiff to follow the fast train beyond O.

**Master and Servant—No Liability Under Federal Employers' Liability Act to Member of Crew for Injury from All Disregarding Train Order.**

8. Where injury to a member of a train crew was caused solely by the entire crew disregarding an order transferring right of track to another train, there was no negligence attributable to the employer, and no liability under the federal Employers' Liability Act.

**Appeal and Error—Judgment for Plaintiff Failing to Show Negligence Reversed and Rendered.**

9. Plaintiff failing to show any negligence attributable to defendant, as was necessary for recovery, judgment will be entered for defendant on reversal of judgment for plaintiff.

From Multnomah: Geo. W. Stapleton, Judge.

In Banc.

For appellant there was a brief over the name of *Mr. Ben C. Dey,* with an oral argument by *Mr. Roscoe C. Nelson.*

For respondent there was a brief over the names of *Mr. Chester A. Sheppard, Mr. Chas. E. Snook* and

*Messrs. Davis & Farrell,* with oral arguments by *Mr. Sheppard* and *Mr. W. M. Davis.*

RAND, J.—The plaintiff brought this action against the director general of railroads to recover damages for personal injuries sustained by him on May 31, 1918, while engaged as a locomotive engineer in operating a freight engine over the road of the Southern Pacific Company between the stations of Oswego and Cook.

At the time of the injury the plaintiff was an experienced locomotive engineer, and was in charge of the engine attached to local freight train No. 231, running from the Brooklyn yards at Portland, Oregon, to Corvallis, Oregon. He was thirty-eight years of age at the time and had been employed by the Southern Pacific Company for about twenty years. He was familiar with the line of track over which his engine was passing, with all of its branch connections as well as with the operation of its trains, with the rules of the carrier and his duty to observe train orders. His run on that day was over the main line from Portland to Corvallis, via Oswego and Cook. Oswego is eight miles from the yards at Brooklyn, and Cook is four miles beyond Oswego. At Cook a branch line from Beaverton, seven miles in length, connects with the main line.

Upon leaving the Brooklyn yards, from one to two hours before the injury was sustained, the plaintiff received written train order No. 226, reading as follows: "No. 234, engine 2911, has right over No. 231, Beaverton to Oswego." In order for No. 234 to reach Oswego from Beaverton, as plaintiff well knew, it was necessary for that train to pass over the branch line to Cook, and from Cook over the main

line to Oswego. Between Oswego and Cook the road runs over a single track. Upon reaching Oswego, the plaintiff, without any knowledge or information as to the whereabouts of train No. 234, and without receiving any contrary or additional order, proceeded to move his train from Oswego to Cook over the same track that he knew train No. 234 would be compelled to take. While en route from Oswego to Cook, plaintiff's train No. 231 collided with engine 2911 of train No. 234, coming from Cook to Oswego. That train consisted of about thirty loaded cars, five empty cars, and a caboose. This head-on collision caused the wreck of both trains and the injuries complained of by the plaintiff, instantly killed the engineer of train No. 234 and injured other employees of that train crew.

The negligent acts of the defendant, upon which plaintiff relies, are set forth in his complaint as follows:

"That on May 31, 1918, the director general of railroads, through his officers and agents, directed the plaintiff herein to proceed with engine No. 2512 from Portland, Oregon, to Oswego, Oregon, by way of Cook, to Corvallis, Oregon, and to haul with the said engine over said line two loaded cars, one empty car and a caboose, which cars were cars used in carrying freight from points outside the state of Oregon, from other states, to points within the state of Oregon and within the state of California; that said cars at said time were hauling freight from points in states outside of the state of Oregon to points within said state of Oregon; that said train was what was known at said time as West Bound Local Freight No. 231; that plaintiff's said train was directed to leave Brooklyn yards, Portland, Oregon, at 9:45 A. M. on May 31, 1918, and did in conformity with said directions leave said yards at said time; that before leaving, the director general of railroads through his

agents, servants and employees caused to be delivered
to Engineman Davis, plaintiff herein, and to Con-
ductor Frederickson, conductor of said train, Order
No. 226, which order read as follows: 'No. 234, engine
2911, has right of way over 231 Beaverton to Os-
wego'; that before leaving the railroad yards at
Brooklyn, Portland, Oregon, and at the time Order
No. 226 was given to plaintiff herein, plaintiff showed
said order to his fireman, who read the same; that
Conductor Frederickson was at the said time given
a copy of said order; that under said conditions plain-
tiff proceeded with said train over the lines of the
Southern Pacific Company to Oswego, Oregon, where
plaintiff in company with the conductor of said train
checked the register and returned to his place in the
engine cab; that at Oswego at said time another train,
known as an electric train, was being run by the di-
rector general of railroads over the same line on
which plaintiff was operating his said train; that by
reason of the fact that said electric train left Oswego
before train No. 231, under the rules and regulations
then in force, it was necessary for plaintiff to remain
at Oswego for the period of ten minutes; that at the
expiration of the said ten minutes, Conductor Fred-
erickson negligently and carelessly gave the order for
plaintiff to proceed with said train on the way toward
Corvallis over the line of railroad as hereinbefore
described; that in compliance with the said order and
direction plaintiff herein started on the way toward
Corvallis over the said line of railroad; that said
train was then and there equipped with an air brake
system, consisting of compressed air pumps, cham-
bers, cylinders, reservoirs, pipe lines and valves, rods,
hangers and brake shoes, which system extended from
the engine at the front end of said train to the ca-
boose at the rear end thereof, and was then and there
in working condition and operative, and so arranged
and equipped that by the simple and easy movement
by a man's hand of a valve (commonly called the con-
ductor's valve) in said caboose, the compressed air
contained in said brake system would be discharged
into the atmosphere and the brake shoes in said sys-

tem would thereby be automatically applied to and held against the wheels of the engine, cars and caboose in said train, and thereby instantly stop said train; that either Conductor Frederickson or any one of the three brakeman who were then and there in said caboose could at any moment have instantly stopped said train by moving said valve and thereby automatically applying said brake shoe to said wheels, and they and each of them should have instantly stopped said train when it then and there started to leave Oswego, and if they had then and there so stopped said train, the collision hereinafter referred to would not have occurred; that Conductor Frederickson and each of said three brakemen negligently and carelessly omitted then and there to move said valve and thereby stop said train. That as plaintiff, in operating said train, approached a cut about twelve hundred feet long, the walls of said cut being ten to thirty feet high, plaintiff herein, without any warning whatever from his fireman or the conductor or any of the brakemen or anyone else, came upon freight train No. 234 approaching at a rate of about twenty miles per hour, said train consisting of about thirty loaded cars, five empty cars and a caboose, hauled by locomotive No. 2911; that the said track at said point was a single line track and the trains were so nearly upon each other that it was impossible for plaintiff to do anything to avert a collision, and the said trains Nos. 231 and 234 came together in a head-on collision with great force at a point about 2.2 miles east of Cook, which is the junction point between the Newberg and Tigard branches of said railroad; that in said collision the plaintiff herein was severely and permanently injured, as more particularly hereinafter set forth; that the force of said collision broke the left cylinder and the frame of locomotive 2512 back to the front drivers, the cab was demolished, the tank frame was broken in two and the trucks bunched near the rear end of the locomotive; the first car in train 231 came to rest upon the top of the tender and was practically destroyed, and locomotive 2911 was greatly damaged and jammed.

"That the carrier, the director general of railroads, his agents, servants and employees, on the 31st day of May, 1918, were reckless, negligent and careless in giving to the plaintiff at Brooklyn, Oregon, Order 226; that said director general of railroads, his servants, agents and employees, were further negligent, reckless and careless in not making said order read: 'Cook to Oswego' instead of 'Beaverton to Oswego' and in not giving said order to the plaintiff at Oswego instead of at Brooklyn; that said order did not comply with the rules of the carrier in that the said order named towns off the line over which plaintiff's train ran, and in that said order did not apprise plaintiff of the position of said train No. 234; that said director general of railroads, his agents, servants and employees, were further reckless, negligent and careless in not giving a meet order requiring plaintiff's train No. 231 to be held at Oswego until train No. 234 arrived there; that under said circumstances it was customary to give a meet order where trains were being operated over a single line of track; that it is and was at said time customary under such circumstances to name only towns on the line over which plaintiff's train ran, and not to name any towns or points not on the line over which plaintiff's train ran; that in this particular said director general of railroads, his agents, servants and employees, were careless, reckless, and negligent; that rule 752 of the carrier reads: 'Conductors and enginemen are required to show their train orders to the brakemen and firemen who must read and return them, and should there be occasion to do so, they will remind the conductor or enginemen of their contents. Conductors must not verbally inform enginemen of the contents of train orders, but should obtain from them an understanding of all train orders restricting their rights, if practicable, before they are acted upon.' That the director general of railroads, his agents, servants and employees, were further negligent and careless in not requiring train 231 to remain at Oswego until train No. 234 arrived, and in giving

a clear train order signal at Oswego, Oregon, and in failing to stop the said train by the use of the air brake system. That each and all of said acts of negligence on the part of the director general of railroads, his agents, servants and employees, was and were the proximate cause of the injuries sustained by plaintiff herein as more particularly hereinafter set forth.''

The answer denied any negligence on defendant's part and in substance alleged that plaintiff's injury was caused solely by his own negligence in disregarding and refusing to obey written train order No. 226, and was not caused by any act or omission of the defendant or of any of the officers, agents or employees of the defendant. As a second offense, the defendant alleged that the plaintiff assumed the risk. The trial resulted in a verdict and judgment for $25,000 in favor of plaintiff, from which defendant has appealed.

This action was brought under the federal Employers' Liability Act, 35 Stats. at L. 65, Chap. 149. Section 1 of the act imposes upon every common carrier by railroad, while engaged in interstate commerce, liability for injury to an employee while employed by such carrier in such commerce, ''resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances * * or other equipment.'' By Section 3 of the act ''the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damage shall be diminished by the jury in proportion to the amount of negligence attributable to such employee.'' By the proviso to Section 3 ''no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where

the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.'' And by Section 4 of the act no employee shall be ''held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.''

1. Where concurring acts of the employer and employee contribute to the injury or death of the employee, the carrier is liable under this act: *Spokane & I. E. R. Co.* v. *Campbell*, 217 Fed. 518 (133 C. C. A. 370), affirmed, 241 U. S. 497 (60 L. Ed. 1125, 36 Sup. Ct. Rep. 683, 689).

''Where the causal negligence is partly attributable to him (the injured employee) and partly to the carrier, he shall not recover full damages but only a proportional amount bearing the same relation to the full amount as the negligence attributable to the carrier bears to the entire negligence attributable to both.'' *Norfolk W. R. Co.* v. *Earnest*, 229 U. S. 114, 122 (Ann. Cas. 1914C, 172, 57 L. Ed. 1096, 33 Sup. Ct. Rep. 654, see, also, Rose's U. S. Notes).

''It is only when the plaintiff's act is the sole cause—when the defendant's act is no part of the causation—that the defendant is free from liability under the act.'' *Grand Trunk W. Ry. Co.* v. *Lindsay*, 201 Fed. 836, 844 (120 C. C. A. 166, 174); affirmed, 233 U. S. 42 (Ann. Cas. 1914C, 168, 58 L. Ed. 838, 34 Sup. Ct. Rep. 581).

''If an act of the employee is the sole cause of the result, it is not contributory, and the railroad company would not be liable therefor, even under the provisions of the employers' liability act.'' *Fletcher*

v. *South Dak. Cent. Ry. Co.*, 36 S. D. 401 (155 N. W. 3).

As there is no suggestion in the pleadings or in the evidence in this case that the carrier violated any statute enacted for the safety of employees, or that the injury resulted in whole or in part by reason of any defect or insufficiency in the property or equipment of the road, in order for plaintiff to recover under the federal Employers' Liability Act, it was necessary for him to show that some negligent act or omission by some officer, agent or employee of the carrier, contributed in some way to bring about the injury complained of, because if the plaintiff's injury was caused solely by his negligence, he cannot recover under the federal Employers' Liability Act.

This case, therefore, presents the question of whether the evidence disclosed any facts or circumstances from which the jury could reasonably infer that any negligent act or omission of the defendant, or that of any officer, agent or employee of the defendant, in any way contributed to bring about, or was any part of the causation, of plaintiff's injury, because it was shown that plaintiff's act was the sole cause of the injury, then defendant's motion for a directed verdict, as a matter of law, should have been sustained, notwithstanding that under the federal Employers' Liability Act "no degree of contributory negligence, however great, will bar a recovery of any damages."

The Director General of Railroads, at the time of the injury, was operating the Southern Pacific Lines under standard rules. Plaintiff had been employed by the Southern Pacific Company for about twenty years. He was an experienced locomotive engineer and he testified that he was familiar with the rules.

Standard rule No. 83 (b) provides: "Enginemen before leaving register stations, except the initial point of their run, will require from the conductor a memorandum on prescribed form showing the numbers of all superior trains, and stating he has checked the register and that they have all arrived or departed, as the case may be." Standard rule No. 906 reads as follows: "Enginemen must know their time on the road, and will not start from a station even though they receive a signal from the conductor, unless they can reach the next station in time to properly clear superior trains." Rule No. 106 provides that: "In all cases of doubt or uncertainty, the safe course must be taken and no risks run." And rule B provides that in case of doubt as to the meaning of any order an application for explanation of the order shall be made to the proper authority.

In support of his allegation that the defendant and the agents, servants and employees of the defendant were negligent in giving plaintiff train order No. 226 and in not making said order read "Cook to Oswego" instead of "Beaverton to Oswego" and in not giving the order to plaintiff at Oswego instead of at Brooklyn, plaintiff, on his direct examination testified that train order No. 226, the order delivered to him at Brooklyn between one and two hours before the collision of trains No. 231 and No. 234 occurred, contained information not essential to the movement of plaintiff's train in that it mentioned Beaverton, a point not on the main line, and hence did not conform to rule No. 201 which reads: "For movements not provided for by time table, train orders will be issued by authority and over the signature of the superintendent. They must contain neither information nor instructions not essential to such

movement." And for that reason alone he contended
that the order, using the language he employed while
testifying, was "inoperative and ineffective." His
contention is that the order should have stated that
train No. 234 had right of way over train No. 231,
Cook to Oswego, and should not have stated, as it did,
that train No. 234 had the right of way over train
No. 231, Beaverton to Oswego, and that because the
order included not only the four miles of track
between Oswego and Cook, over which both trains
were to pass, but also the seven miles of the branch
line from Beaverton to Cook, over which train No.
234 alone was to pass, the order was a nullity and
the plaintiff had a right to disregard it *in toto,* and
it was so argued and insisted upon, upon the argu-
ment here, and this is the principal contention in the
case.

It appears from the testimony that train orders
of the character of the one involved here, that is,
train orders inverting or reversing the rights of
trains and giving to an inferior train a superior
right over a prescribed track, are duplicate orders
given in identical terms to the different train crews
affected by the order, and hence that part of the
track between Beaverton and Cook, although not a
part of the track over which plaintiff's train was
to run, yet was an essential part of the movement of
train No. 234 in passing from Beaverton to Oswego;
and, if this is true, train order No. 226 was in entire
conformity to the requirements prescribed by rule No.
201. But, however that may be, it conclusively
appears from plaintiff's own testimony that he
thoroughly understood the meaning and effect of
this order. He knew that in going from Beaverton
to Oswego, train No. 234 would have to pass over

the branch line to Cook, and then, for a distance of four miles, over the main line from Cook to Oswego, and that his own train, to reach Cook, would have to go over the same track between Oswego and Cook that train No. 234 would be compelled to use in its movement from Beaverton to Oswego. This order, therefore, contained all of the information essential to the safe movement of both trains, and if plaintiff had complied with its directions he could not have received the injury complained of. The order could not, and did not, mislead the plaintiff, and it stated the movement of train No. 234 exactly as intended for it to move, and informed the plaintiff that train No. 234, upon its arrival at Cook, would pass over the main line from Cook to Oswego, and, while passing from Cook to Oswego, was superior in right to plaintiff's train No. 231 over the four miles of track between said points. That plaintiff understood this order to mean exactly that, and nothing else, is apparent from his own testimony. On his direct examination he testified: "The order was given to us at Brooklyn, handed to me by the conductor, from 31, addressed to train No. 231 at Brooklyn, to C. and E.—231—that is, conductor and engineer. 'No. 234 engine 2911 has right over No. 231, Beaverton to Oswego.' Q. What train ordinarily has right of way, 234 or 231? A. 231 had right of way by time-table movement. Q. How could that right of way be changed under the company's rules? A. Only by train order. The only time you can relieve a train of its rights is with a train order. Q. How far could you go with this order or would this order affect your train? A. This order was given out giving rights over us, 'Beaverton to Oswego' rule No. 201. This order gave No. 234 right over us from a

point on the line over which we did not run.
Q. When it is desired to change the rights of way
in opposition to the time-table what kind of an order
would you receive? A. No. 234 has right over 231
from Cook to Oswego—over our lines. Q. Would
that kind of an order give 234 right of way over you?
A. Yes. Q. How under the rules did you interpret
order No. 226 as it was given to you? A. Inoperative
and ineffective. The Court: What do you mean by
that? The Witness: That the order didn't con-
form to the standard rules not naming points on
which our train was scheduled to run. It gave this
train right over us over a piece of track seven miles
in length that our train wasn't scheduled to run over,
over this branch from Beaverton to Cook. Q. Beaver-
ton to Oswego was the order? A. Yes, Beaverton
to Oswego was the order. There is a space of eleven
miles in there,—they gave them orders over us
eleven miles when we only traversed four miles of
this track. We were on our way to Corvallis by
the way of ——. The Court: It would cover four
miles of your track? A. Yes, it would cover four
miles of our track. Q. Mr. Davis, you read a few
moments ago rule No. 201, now I ask you if that
order conformed to rule 201? A. No, sir. Q. Why
not? A. As it contained information not in regard
to the operation of our train. Q. What did you have
this time, what kind of an order did you have this
time? A. Right of track order from Beaverton to
Oswego. Q. If this order had been made Cook to
Oswego, what would it have been, a meet or wait
order? A. It would have been a right of track order.
A juror: What does he mean by a right of track
order? A. Transferring the rights of the train. Q.
What is the difference between that and a meet

order? A. A meet order designates a certain spot that trains shall meet, right of track order transfers the right of trains. The Court: If it had 'Cook to Oswego' it would mean that you had to stay at Oswego until the other train got there? A. Not necessarily. Under the other rules it simply switches the rights around of these two trains. If a superior train has its right transferred to another train it can still proceed as long as he clears the other fellow's schedule. The Court: It would give the inferior train the right of way provided it could get to the connecting point first? A. Yes, he would have to clear his schedule as provided by the rules to any point along the line which you could clear. The Court: At what time on the time-table was the Beaverton train to get to Cook? A. No. 234 was a train that we rarely ever saw, it was scheduled into Brooklyn hours before we were due out. It was a train that for weeks and weeks and weeks we would never even hear of.''

On cross-examination plaintiff testified: ''Q. When you got this order at Brooklyn what sort of a form was it on? A. Form 31. Q. You read the order? A. Yes. Q. The conductor handed it to you? A. Yes. Q. And you read it? A. Yes. Q. Did you have any doubt about its meaning? A. No, sir. Q. What did you think it meant, just what it said, what did you think it meant? A. Train 234 has right over 231 Beaverton to Oswego. Q. Did you note the route that train 234 would take, Beaverton to Oswego? A. Yes. Q. You knew that route would be Beaverton to Cook and Cook to Oswego? A. Yes. Q. And you knew that your route lay from Oswego to Cook? A. Yes. Q. And you knew under that route you would traverse the same route of track that 234

would traverse? A. Yes. Q. And yet you consid-
ered that order meaningless? A. The order was in-
effective and inoperative. Q. Why? A. It did not
mention the stations over which our train traversed.
Q. Did it mention Oswego? A. Yes. Q. Was your
train affected there? A. No, sir. Q. You didn't go
to Oswego? A. We went through Oswego. Q. You
would have to go from Oswego to Cook? A. Yes.
Q. And that train would have to go from Cook to
Oswego? A. It would. Q. And yet you tell the jury
that that order did not affect you? A. No, that order
did not affect me, it was not in the regular form. Q.
And you had no doubt about it whatever? A. Men-
tioning track over which our train did not run. Q.
You had no doubt about the meaning of that order?
A. No, sir. Q. You had no doubt that it was abso-
lutely meaningless as far as you were concerned?
A. Yes. Q. You did not know why it was even
handed to you? A. Orders are frequently handed
to me that have no meaning. Q. On form 31? A.
On various forms. Q. Orders restricting the move-
ments of your train and making other trains superior
to you are handed to you and have no meaning? A.
Yes. Q. That is your statement to this jury? A.
Yes. Q. An order converting your train from an
inferior to a superior train is handed to you and it
has no meaning? A. This order had no meaning
as far as I was concerned. Q. Didn't this order ex-
pressly refer to train 231? A. Yes. Q. Wasn't that
your train? A. Yes. Q. Wasn't it addressed to the
conductor and engineer of train 231? A. Yes. Q.
Didn't it tell the conductor and engineer of train 231
that train 234 had a right of way over them? A.
Yes. Q. And yet you tell the jury that that order
had nothing to do with you? A. Yes. Q. You didn't

bother about that order? A. That order was ineffective and inoperative because it was not up to the form of the rules. Q. And you knew, Mr. Davis, that if you disobeyed an order restricting your rights and making another train superior over you and giving another train the right of way, that if you should disobey such an order that it might mean death to not only one but to a hundred people, didn't you? A. Yes. Q. And yet you took the responsibility of determining that that order meant nothing, that is what you tell the jury? A. I take this stand that that order was meaningless to me, it was not in conformity to the rules, that I would act upon that order again the same as I did that day. Q. And you as an engineer would take an order of that kind and put your construction on it in that way? A. Yes. Q. Because you did not think it followed a certain form? A. Yes. Q. And because it included a territory larger than what you considered necessary? A. Yes. Q. Your only objection to that order is that instead of just saying Cook to Oswego it said too much, it said Beaverton to Oswego? A. That order does not conform to the rules. Q. Is there any other objection to that order that you know of except instead of simply saying Cook to Oswego it included too much territory and said Beaverton to Oswego, is there any other defect in that order? A. Yes, that order did not give right of track over us, over the line which we traveled. Q. If it had said Cook to Oswego, you think it would? A. Yes. Q. Then I repeat the question again, I would like to have you tell me whether there was any other informality in that order except the fact that you think that it included that territory from Beaverton to Cook, anything else about that order that you figure? A. That was

enough.  Q. Was there anything wrong about that
order except that it started at Beaverton over that
line to Oswego rather than starting at Cook?  A.
The form that the order was given in nullified it.  Q.
Was there anything else that nullified it except the
fact that it included more track there, other track in
the order than that over which you were to go?  A.
There was nothing else in the order, your Honor.
Q. Then you can answer the question yes or no.
A. No.  Q. Now what is your duty when you have
a doubt as to the meaning of an order?  A. Take
the safe side.  Q. If there is anything peculiar about
it or that you don't understand do you run your train
without getting an explanation of it?  A. If the or-
der affected me I get an explanation from the dis-
patcher.  Q. You are familiar with rule 'B' in the
very beginning of the rule to the effect that employees
must be conversant with and must obey the rules,
and if there is any doubt about the orders they must
apply to the proper authority for an explanation of
the order?  A. Yes.  Q. You knew that rule, didn't
you?  A. Yes.  Q. You were familiar at that time
with rule 106 which reads: 'In all cases of doubt
or uncertainty the safe course must be taken and no
risks run'?  A. Yes, sir.  Q. You are familiar with
those rules?  A. Yes.  Q. And when you saw that
order you had never seen an order like that?  A.
No, sir.  Q. Never in all your experience?  A. Never
had had an order like that before.  Q. Giving the
other train the right of way over you from Beaverton
to Oskego, whereas you ran only from Oswego to
Cook so far as that, and yet you did not apply for
any explanation of that or for any further informa-
tion on the subject, and having that order in mind
giving that train the right of way from Beaverton to

Oswego, knowing that it would have to go by way of Cook, you deliberately left Oswego, is that the fact? A. Yes. Q. That is what you tell the jury? A. Yes. Q. When you left Brooklyn you knew that that train 234 had not reached Brooklyn, didn't you? A. Yes. Q. How did you know it? A. If that train had reached Brooklyn, we would not have received that order. I would not check against that train if it was in at the time I was at the register to check against it. Q. You say now do you that you knew 234 had not gotten into Brooklyn? A. Yes. Q. You knew that it was somewhere between Beaverton and Brooklyn? A. I didn't know where the train was, Mr. Nelson. Q. You didn't know— A. No. Q. When you got to Oswego you looked at the train register there? A. Yes. Q. And had 234 gotten into Oswego? A. I did not check against train 234. Q. You did not even look to see whether it had gotten there? A. I didn't have to check against the train 234. Q. You had this order? A. Yes. Q. And you did not look to see whether that was in, you didn't look to see whether that train was in? A. No, sir, didn't check against train 234. The Court: Why didn't you? A. It wasn't necessary, it didn't affect our right. The Court: That was the reason you didn't do it, because you didn't think it affected you? A. Yes. Q. Is that the train register that you checked? A. Yes, sir. Q. That register does not show 234 in, does it? A. No, sir, it does not show 234 in. Let me see that book again (Witness examines the book referred to). No, sir. Q. Now when you passed Oswego or before leaving Oswego, did you get any card or check from the conductor? A. No, sir. Q. Why not? A. I was in the depot for a drink of water and the conductor asked me if I

would check the register while there with him. Q. I will ask you whether or not you were familiar at that time with the rule 83 (b) which reads as follows: 'Enginemen, before leaving register stations, except the initial point of their run, will require from the conductor a memorandum on prescribed form showing the numbers of all superior trains, and stating he has checked the register and that they have all arrived or departed, as the case may be.' Were you familiar with the rule? A. Yes. Q. You did not require that from him, did you? A. No, sir, I was there and checked in person with him. Q. If you have an order which gives another train superior right over you, have you any right to leave the station because the conductor waves you to go ahead? A. No, sir. Q. The rules specifically provide that, don't they? A. Yes, sir. Q. And to get this clearly before the jury your present position is that you had that order in mind, that you remembered it, but notwithstanding that you treated it as a meaningless and ineffective and inoperative order and you proceeded upon that single track from Oswego to Cook? A. Yes. Q. You had had your usual rest and all the night before, hadn't you, Mr. Davis? A. Yes, sir. Q. And at the time of this collision you had only been on duty for about an hour or two? A. Yes. Q. And the only other order that you had was this one about No. 16 which applied only for a couple of miles? A. Yes. Q. After that you had no orders except this inoperative and ineffective order? A. No, sir. Q. And there wasn't any train that you had to meet for several hours, was there? A. No, sir.''

That the plaintiff did understand the meaning and effect of this order clearly appears from the

admissions contained in the above testimony. Knowing that his disobedience might cost the lives of others and injury or death to himself, he neither sought nor asked for an explanation of the order, as he certainly would have done if he had had any doubt or uncertainty as to its meaning. If any doubt of the meaning of the order had existed the plaintiff had an opportunity to ask and obtain from the train dispatcher a full explanation of its meaning both at Wilsonia and later at Oswego. As to this he testified: "After oiling and loosening up we pulled out of there into Wilsonia, we stopped, called up the dispatcher and were told to remain there until No. 355 went by, which we did, and being in the yard limit we were able to follow No. 355, under control, to the depot at Oswego." At Oswego there was a telegraph operator, and plaintiff testified that he waited at the depot there for ten minutes before starting for Cook. Plaintiff thus had every opportunity at his command to ask for and obtain any explanation necessary for a complete understanding upon his part of the meaning of this order.

The conductor of train No. 234 was called and testified: "Q. I wish you would state to the jury whether or not you received any order known as order No. 226 at Beaverton or elsewhere that morning? A. I received the order at Beaverton giving me right of way over No. 231 to Oswego. Q. Giving your train right of way over No. 231 to Oswego? A. Yes. Q. Did your engineer, Mr. W. W. Knight know of that order? A. Yes. Q. You tell the jury whether you proceeded under that order. A. It gave us right to go to Oswego over No. 231, that was our understanding. The Court: Did you proceed under that order? A. Yes. Q. And what

did you do under that order? A. We started to run from Beaverton to Oswego. Q. You went from Beaverton to Oswego? A. Yes, sir. Q. And where did you meet this train of Walter Davis, No. 231? A. In the cut about half a mile this side of Oswego, or a mile, or something like that. Q. Between Cook and Oswego? A. Yes. Q. Where is engineer W. W. Knight of your train? A. Dead. Q. What happened to W. W. Knight in that collision? Mr. Sheppard: That don't tend to prove any issue in this case. The Court: No, he is dead, did he die from the effects of that collision? A. As far as I know he was instantly killed. The Court: He was killed right there? A. Yes. The Court: That ends it. Q. You yourself were injured, were you not? A. Yes. Q. I wish you would state to the jury whether you or Mr. Knight, as far as you know, had any question about this order, order No. 226, whether it was meaningless or ineffective or inoperative in your interpretation of it. A. As near as I remember I showed him the order and his understanding was the same as mine, that we would go to Oswego for No. 231. I don't remember whether there was any other conversation or not. Q. Will you state to the jury whether or not that was a right of way order or a meet order or a wait order? A. That was a right of track order."

2. Considerable stress is laid upon the fact that the division examiner of the defendant testified that the insertion of the words "Beaverton to Oswego" instead of "Cook to Oswego" was technically a violation of rule No. 201. But what possible difference in the information conveyed or in the duties imposed could have resulted to the plaintiff if, instead of reading as it did, the order had read: "Train No.

234, after reaching Cook from Beaverton, has right of way over train No. 231, Cook to Oswego," or "Train No. 234 has right of way over train No. 231 Cook to Oswego?" Plaintiff's admitted knowledge of and familiarity with the lines and stations involved here were such that no reasonable inference could be drawn by the jury from the testimony that the plaintiff was misled or could be misled by anything contained in the order, and therefore the manner in which the order was worded did not contribute to plaintiff's injury.

3. It appears from plaintiff's testimony that when approaching the station at Oswego he signaled the operator for the train order semaphore signal, and that the operator dropped the semaphore bar. It is contended that this signal by the operator gave plaintiff a clear track to Cook- and the right to proceed with his train from Oswego to Cook. This contention has no merit. The dropping of the bar by the dispatcher could give him no right to proceed contrary to orders previously received. The only effect of this signal was to inform him that the dispatcher at Oswego had no order in his hands for the conductor and engineer of the train. The signal given by the operator did not supersede or in any way change or modify the effect of the order previously given. That plaintiff was fully aware of this fact is shown by his own testimony, on direct examination, as follows: "Q. When you got to Oswego did the operator there have any duty to perform? A. We approached the depot and called for the train order semaphore signal and it was cleared to us, showing that there were no orders on the table for us." Again he testified: "Coming into Oswego,—the train order semaphore was against us

and I called for the train order semaphore signal
with the four blasts of the whistle, which is the rule
and received the signal, which is done by the opera-
tor dropping it in an inclined position, which clears
us, clears the board and shows that he has no orders
for us." The order previously given could only be
revoked by a subsequent order, and when the opera-
tor signaled that he had no order for train No. 231,
plaintiff knew that the previous order had not been
revoked, countermanded or superseded.

4. It is insisted that plaintiff is entitled to recover
because just before plaintiff pulled the train out of
Oswego, the conductor gave him the signal to pro-
ceed. Train order No. 226 applied to the conductor
of the train as well as to the engineer. It was ad-
dressed to both, and it was the duty of both to ob-
serve it. The conductor had no authority to violate
the order nor to direct the engineer to violate it.
Both knew that it was binding on both of them and
that that neither one had authority to direct the
other to disregard it. In this contention, the plain-
tiff testified: "Q. Now, if you have an order which
gives another train superior right over you, have
you any right to leave the station because the con-
ductor waves you to go ahead? A. No, sir. Q. The
rules specifically provide that, don't they? A. Yes,
sir." It is contended that because trains are started
invariably upon a signal from the conductor to the
engineer, that the jury had the right to assume in
this case that the engineer was justified in violating
his order and starting his train upon the signal of the
conductor. This contention overlooks the fact that
although it is the duty of the engineer to obey the
signal of the conductor in starting the movement of
his train in cases where the movement signaled for

is not in violation of a train order or rule, nevertheless, under rule No. 906, it is the duty of the engineer in all cases not to start his train in violation of a train order. That plaintiff well understood this rule and recognized his duty thereunder is apparent from the testimony above quoted. When signaled by the conductor to proceed from Oswego to Cook, it was his duty to refuse to obey the signal, and his compliance with a signal that, at the time, he knew the conductor had no authority to give, and that as engineer he had no right to obey, ought not to confer upon him a right to recover damages sustained solely by reason of his conscious violation of the rules of his employer.

5. It is contended that it was negligence for the train-dispatcher to give the train crew of train No. 231 a right of track order instead of giving a meet order or a wait order. The rules provide that an order may be given in any one of these three forms, and each have a well defined and perfectly understood effect and meaning. The carrier may, therefore, lawfully give any one of these three orders as the circumstances of the case may require. There is no evidence in the case of any fact from which it could fairly be inferred that the train-dispatcher in giving train order No. 226 did not give a proper order or that a right of track order was not the kind of an order which the circumstances then existing demanded, and for that reason there is no merit in this contention.

6. It is also contended that a copy of this right of track order should have been sent by the dispatcher to the operator at Oswego and should have been again delivered at that point to the conductor and engineer of train No. 231. The rules provide that

where a meet order or a wait order is given a copy of the order is sent to the operator at the meeting or waiting point, while in the case of a right of track order the rules do not require a copy of the order to be given to anyone except the conductor and engineer of the crews affected by the order. The rules are standard rules; and there was nothing in the testimony tending to show that it was the duty of the carrier to do anything more than to comply with their directions. Train order No. 226 was given to the plaintiff less than two hours before plaintiff sustained the injury complained of, and his own testimony shows that his refusal to obey the order was the direct and proximate cause of his injury. He testified that he remembered the order and had it in mind when leaving Oswego. Therefore no reason could exist for giving him the same order twice. This contention seems to be based upon the theory that it was the carrier's duty to keep the plaintiff advised of the train movements of train No. 234, and that the plaintiff had the right to disregard this or any other train order, unless he was constantly kept advised of the whereabouts of the other train. Plaintiff, having been notified that train No. 234 had a superior right over his train between the stations of Oswego and Cook, it was his duty to remain at Oswego until the arrival of the superior train and the carrier was under no obligation to repeat the order at Oswego or to inform him when the superior train left Cook.

7. It was argued that plaintiff's train, while at Wilsonia, was directed by the train-dispatcher to follow another train, and that on account of this direction the plaintiff was justified in starting to move his train to Oswego. There is neither allegation nor

108 Or.—7

proof to support this contention. The only proof
bearing upon this matter at all is plaintiff's testi-
mony as follows: "It comes in here at Wilsonia. It
is the rules for all trains before entering this point
of tract here to call up the dispatcher and get per-
mission to proceed or stay at this point until such
time as the dispatcher gives you the authority to
move,—which we did in this case this morning,—
stopped there, called up, and he said 'Follow No. 355'
which was one of the fast red trains which go up
Fourth Street here to points beyond where we were.
Half a mile beyond Wilsonia is Oswego, where there
is a day and night telegraph office, train register, and
train order signal semaphore, and also terminal point
for suburban trains. * * After oiling and loosening
up we pulled out of there on to Wilsonia, we stopped,
called up the dispatcher and were told to remain
there until No. 355 went by, which we did, and being
in the yard limit we were able to follow No. 355,
under control, to the depot at Oswego." This testi-
mony wholly fails to show that plaintiff was directed
to follow train No. 355 beyond Oswego. The distance
from Wilsonia to Oswego is about one half of a mile.
Plaintiff nowhere in his testimony pretends that he
started from Oswego to Cook on account of any direc-
tions given while his train was at Wilsonia, but bases
his right to move from Oswego on the sole ground
that train order No. 226 was inoperative and void.

8. The only testimony offered on behalf of the
plaintiff was his own testimony. No other member
of the train crew of train No. 231 was called or testi-
fied except the conductor, who was called by the de-
fendant, and he testified to nothing except that he
was the conductor of that train, that he was dis-
charged by the company, and that he was subpoenaed,

but not called by the plaintiff. The only explanation
of plaintiff's starting from Oswego to Cook is that
contained in plaintiff's own testimony. Whether or
not plaintiff and the other members of the train crew
believed at the time they left Oswego that they could
reach Cook before train No. 234 proceeded on its
way from Cook to Oswego, it is impossible to say
from the record. That would seem to be the only
reasonable conclusion for plaintiff's conduct, although
there is no testimony from which that deduction can
be drawn. The burden of proving negligence upon
the part of the defendant rested with the plaintiff,
and if there was any negligence, which in any way
contributed to plaintiff's injury, on the part of any
member of the train crew other than the plaintiff,
plaintiff has wholly failed to establish it. The only
thing done by any member of the train crew which the
plaintiff himself did not do, so far as the testimony
discloses, was the giving by the conductor of the sig-
nal to proceed from Oswego. The fact that the
conductor and the other members of the train crew
participated with plaintiff in the violation of the di-
rections given by train order No. 226 is not sufficient
in law to establish negligence upon defendant's part.
It was the duty of every member of that crew to
obey this order, and the fact that all of them refused
to do so ought not, and, in our opinion, does not
amount to negligence upon the part of the carrier
any more than it would if the engineer himself had
been the only member of the crew on the train operat-
ing it beyond Oswego. The plaintiff was charged with
the primary responsibility of moving the train, and it
was his hand alone that moved the train from Os-
wego to the place of the wreck. In doing this he
violated train order No. 226 and rules No. 83 (b)

and No. 906. He had no right to leave Oswego until he had received a memorandum from the conductor showing that all superior trains had arrived, and it was his duty to refuse to start when signaled by the conductor, and it was his own act, and his own act alone, which produced the injury he complains of. According to his own testimony his conduct was willful, deliberate and intentional, and he offers no excuse or justification for his conduct. He brought about the death of the engineer of train No. 234, who was rightfully proceeding from Cook to Oswego, and who was acting in strict conformity to train order No. 226. To hold that Congress intended, by the federal Employers' Liability Act, under the circumstances disclosed in this case, to penalize the carrier and to reward the disobedient employee with a judgment against the carrier or $25,000 is unthinkable, and until such a construction is placed upon that act by the federal courts, this court ought not to uphold this judgment.

Viewing this situation, as presented by the testimony of the plaintiff, in the most favorable light possible for the plaintiff, and assuming that all of plaintiff's train crew consented to his violation of the order and rules of the carrier, and assisted him in operating the train from Oswego to the scene of the wreck, the most that can be claimed for it is that although they were all acting in concert, nevertheless none of the others did any separate negligent act or omitted to do any act which can be imputed to the defendant as the negligence of the defendant, or which, in any way, contributed to the injury sustained by the plaintiff. If all of the train crew, except the plaintiff, had left the train at Oswego, the acts performed by the plaintiff alone, as shown by

his own testimony, would have brought about the collision and the consequent damage.

The defendant had the right to promulgate this order to its train crew and to demand implicit obedience from each and every member of that crew. The concerted action of all or any member of the train crew, in disregarding the command of the employer, should not be imputable to the defendant as the negligence of the defendant in an action against it brought by a member of the crew for injury resulting solely from his own disobedience or his disobedience in concert with others. In a case where two or more railroad employees, acting in concert, do an act intentionally in known violation of their duty, without any concurring act of negligence on the part of the carrier or of any agent, servant or employee of the carrier, except those actually engaged in the doing of the concerted act, what possible justification in law can there be for holding that the company is liable for an injury to one of them merely because the doing of the concerted act by all was participated in by more than one person, when, under the same circumstances, the company would not be liable if the act had been done by the injured employee alone.

We are unable to find any authority for holding that the carrier is liable under circumstances similar to those disclosed by the testimony of the plaintiff. If the evidence in this case had disclosed that some one or more of plaintiff's train crew had done some separate and independent act, which, in any way, contributed or co-operated to bring about plaintiff's injury, or if it had been shown that the defendant had violated any statute enacted for the safety of employees, which, in any way, contributed to the injury.

of the plaintiff, or that the injury had resulted in whole or in part by reason of any defect or insufficiency in the property or equipment of the road due to the negligence of the defendant, then the plaintiff would clearly be entitled to recover under the federal Employers' Liability Act, but, under the circumstances disclosed, we are of the opinion that the plaintiff is not entitled to recover.

We, therefore, conclude that when two or more railroad employees act in concert and none of them do any act except that which every other one intends that he shall do, and injury results to one or more of them from the combined act of all, and the doing of the combined act was known by all of them to be wrongful or in disregard of a known duty or in violation of a positive order of the carrier, and was not in obedience to an order of a superior, none of the parties so acting are entitled to recover under the federal Employers' Liability Act, when the doing by them of the act is the sole proximate cause of the injury and no concurring negligent act or omission of the carrier or of some other agent, servant or employee of the carrier in any way contributed to bring about the injury.

Plaintiff relies upon the case of *Spokane & I. E. R. Co.* v. *Campbell,* 241 U. S. 497 (60 L. Ed. 1125, 36 Sup. Ct. Rep. 683), as an authority to support his right of recovery, but a careful reading of the opinion in that case will disclose that the issues involved, and under consideration there, were so dissimilar to those involved here, that the principles there announced are wholly inapplicable to the admitted facts in this case. In that case, Campbell, the plaintiff in the court below, was the motorman in charge of a special train running between Spokane and Coeur

d'Alene. The discussion in that case arose largely from the fact that the jury returned a general verdict in favor of the plaintiff and made three special findings in writing as follows: "(1) That Campbell, before leaving Coeur d'Alene received a train order reading as follows: 'Motor 5 will run Spl. C. d'Alene to Spokane, meet special 4 east at Alan'; (2) that the air brakes on Campbell's train immediately before the collision were insufficient to enable him to control the speed of the train; (3) that Campbell's leaving Coeur d'Alene in violation of his orders was the proximate cause of the accident."

It will be noticed that the second special finding established that the air-brakes on Campbell's train were insufficient to enable him to control the speed of his train, and the evidence disclosed that Campbell saw the train with which he came into collision, causing his injury, at a distance of eight hundred feet from the place where the collision occurred, and could have stopped his train if his air-brakes had worked properly, and that the other train had been stopped and was standing still at the time of the collision. These facts were sufficient to entitle him to recover, regardless of whether he was acting in violation of his order or otherwise, as the concurring negligence of the carrier in not supplying him with efficient air-brakes, if not the sole proximate cause of his injury, contributed to his injury. And in that connection, that court said:

"It is too plain for argument that under this legislation the violation of the safety appliance act need not be the sole efficient cause, in order that an action may lie. The Circuit Court of Appeals (133 C. C. A. 370, 217 Fed. 524) held that the element of proximate cause is eliminated where concurring acts of the employer and employee contribute to the injury or

death of the employee. We agree with this, except that we find it unnecessary to say the effect of the statute is wholly to eliminate the question of approximate cause. But where, as in this case, plaintiff's contributory negligence and defendant's violation of a provision of the safety appliance act are concurring proximate causes, it is plain that the Employers' Liability Act requires the former to be disregarded.''

That part of the opinion upon which the plaintiff in this case relies was based solely upon the contention of the carrier to the effect that Campbell was not in the course of his employment when injured, and to show how inapplicable that case is to this, we quote that part so relied upon by the plaintiff:

''It is most earnestly insisted that the findings established that Campbell was not in the course of his employment when he was injured, and consequently that judgment could not properly be entered in his favor upon the cause of action established by the general verdict. This invokes the doctrine that where an employee voluntarily and without necessity growing out of his work abandons the employment and steps entirely aside from the line of his duty, he suspends the relation of employer and employee, and puts himself in the attitude of a stranger or a licensee. The cases cited are those where an employee intentionally has gone outside of the scope of his employment, or departed from the place of duty. The present case is not of that character; for Campbell, as the jury might and presumably did find, had no thought of stepping aside from the line of his duty. From the fact that he disregarded and in effect violated the order as actually communicated to him, it, of course, does not necessarily follow that he did this willfully. The jury was not bound to presume—it would hardly be reasonable to presume—that he deliberately and intentionally ran his train out upon a single track on which he knew an incoming train with superior rights was then due. How-

ever plain his mistake, the jury reasonably might find it to be no more than a mistake attributable to mental aberration, or inattention, or failure for some other reason to apprehend or comprehend the order communicated to him. In its legal effect this was nothing more than negligence on his part, and not a departure from the course of his employment. To hold otherwise would have startling consequences. The running of trains on telegraphic orders is an everyday occurrence on every railroad in the country. Thousands of cases occur every day and every night where a failure by conductor or engineer to comprehend or to remember the message of the train dispatcher may endanger the lives of employees and passengers. We are not aware that in any case it has been seriously contended that because an engineer violated the orders, he went outside of the scope of his employment. If he did so, in the sense of absolving the employer from the duty of exercising care for his safety, it is not easy to see upon what principle the employers' liability to passengers or to fellow employees for the consequences of his negligence could be maintained. The unsoundness of the contention is so apparent that further discussion is unnecessary."

In that case there were two concurring causes contributing to Campbell's injury. His running the train in violation of orders was one. His train being equipped with defective air-brakes was the other. Because of the defective air-brakes he was prevented from stopping his train when he saw the other train approaching from the opposite direction, as he could have done, thereby saving himself from injury if the carrier had been negligent in equipping his train with defective air-brakes.

Another case relied upon by the plaintiff is that of *Illinois Central R. R. Co.* v. *Skaggs*, 240 U. S. 66 (60 L. Ed. 528, 36 Sup. Ct. Rep. 249, see, also,

Rose's U. S. Notes). In that case it was claimed that Skaggs could not recover for the reason that the injury resulted from his own act or from an act in which he participated. In disposing of this contention, among other things, the court said:

"It may be taken for granted that the statute does not contemplate a recovery by an employee for the consequences of action exclusively his own. * * But, on the other hand, it cannot be said that there can be no recovery simply because the injured employee participated in the act which caused the injury.

"We think that the argument for the plaintiff in error overlooks the inferences of fact which the jury was entitled to draw. Thus, the jury could properly regard the two brakemen as assisting each other in the movement in question. Such assistance was certainly appropriate, if not absolutely necessary. The very purpose of having two brakemen was not to put upon either the entire responsibility. Working together under the exigencies of such operations, particularly when conducted in the night time, it was manifestly contemplated that the one brakeman would supplement the other, and not be compelled, at the peril of his rights, personally to examine what the other did, or the basis of the reports the other gave. Each had a reasonable latitude in relying upon the statements of the other, made in the course of the operation and as a part of it. The Supreme Court of the state said: 'It was a very dark night, and evidently there was necessity for haste. If plaintiff's story is true, Buchta was in a position to know about clearance, while plaintiff was not; and we are unable to say plaintiff had not the right to rely upon his statement in regard thereto.' (124 Minn. 506, 145 N. W. 381.) In this we find no error. When the engine was uncoupled, Skaggs was on the right-hand side—the side of the passing track—a better place to judge the clearance. The fact that Skaggs asked his questions is itself not without significance. These questions indicated doubt on Skagg's part, while

Buchta's reply showed certainty on his. It was plainly permissible to infer from the testimony that the two men were not in positions of equal advantage, and Skaggs was entitled to the exercise of reasonable care on the part of Buchta in observing and reporting the position of the cars. As there was evidence upon which it could be found that Buchta was negligent, and that thereby injury resulted to Skaggs, it cannot be said that the recovery in this aspect of the case was contrary to the statute.''

The determining facts in that case were that there were two brakemen working together but on opposite sides of the train; that the two brakemen were not in position of equal advantage, and that the one injured was entitled to the exercise of reasonable care on the part of the other brakeman in observing and reporting to him the position of the cars, which cars, on account of their being so close to another track, caused plaintiff's injury; that Skaggs, the injured brakeman, was at the time of the injury relying upon a condition which the other brakeman had informed him was free from danger, and that although both were negligent and the injury resulted from such negligence, the plaintiff was not compelled, at the peril of his rights, personally to examine what the other did, and that he had the right to rely upon the statement of the other as to the position in which the cars were at the time of the injury. There is so striking a dissimilarity of facts in that case to the facts in this case that, we think, that decision is not applicable to the questions involved in the present case.

In the case of *Union Pacific R. Co.* v. *Hadley*, 246 U.'S. 330 (62 L. Ed. 751, 38 Sup. Ct. Rep. 318), the third case relied upon by the plaintiff, it was contended by the railroad company ''that it was not negligent'' and ''that the deceased brakeman would not have been

killed if he had done his duty and had gone back to warn the following train instead of remaining in the caboose as he did, and that this was the proximate cause of his death."

It is unnecessary to quote at length from the opinion, but the court disposed of the contention by deciding that the defendant company was negligent, and that the death of the deceased brakeman resulted in part from the negligence of defendant's employees. The following sentence taken from the opinion will show that that court held the railroad company to be negligent: "It (the railroad company) ran one train into another when, if it had done its duty, neither train would have been at that place." The running of one train into another, causing the death of the deceased brakeman, was negligence on the part of the defendant company. Therefore, although the deceased brakeman himself was negligent, his contributory negligence did not bar a recovery for his death, which would not have occurred if the defendant company had not negligently run another train into his. The case is therefore not in point.

We think the facts bring this case within the rule followed in the case of *Virginian Ry. Co.* v. *Linkous,* 230 Fed. 88 (144 C. C. A. 386). That action was brought under the federal Employers' Liability Act to recover damages for the death of plaintiff's intestate, an engineer of a coal train. The engineer and the conductor had received an order to meet and pass another train at Keever. Instead of stopping the train at Keever, as directed, the engineer, with the conductor, the front brakeman and fireman, all riding on the engine, proceeded at full speed for a distance beyond Keever, where their train collided with the train that they had been ordered to meet and

pass at Keever. All four of them were killed in the collision. Copies of the order were found in the pockets of the engineer and of the conductor. Plaintiff had judgment, but upon appeal, the Circuit Court of Appeals reversed the judgment, and, among other things, said:

"It is insisted by counsel for plaintiff in the case at bar that plaintiff's decedent lost his life 'as a result of a combined mutual, concurring, and joint failure of these four men to fulfill their primary duty by executing the order to meet No. 33 according to its terms and as prescribed by the defendant's rules, which was the controlling and proximate cause of the collision.' * * While the Employers' Liability Act was manifestly intended to modify the law as it formerly existed so as to materially benefit those who might be injured in the future, by abolishing the harsh rule known as the 'Fellow-Servant Doctrine,' yet it cannot be reasonably insisted that it was the purpose of the act to afford relief where one's injury is due solely to his own reckless and indifferent conduct. After an exhaustive examination of the authorities cited we find nothing to support the contentions of the plaintiff. Under the circumstances the jury could not reasonably have drawn any other inference than that the other employees were not in any degree primarily responsible for the accident. Such being the case, we are of opinion that the jury was not warranted in reaching the conclusion that plaintiff's decedent's death resulted in whole or in part from the negligence of the employees of the defendant."

After an argument upon rehearing, the court adhered to its former opinion: 235 Fed. 49 (148 C. C. A. 543). As stated by Mr. Roberts in 1 Roberts' Federal Liability of Carriers, Section 547: "It is not the purpose of the statute to afford relief where one's injury is due solely to his own reckless and indifferent conduct." And in his discussion of

the case of *Virginian Ry. Co.* v. *Linkous, supra,* that
author says:

"The engineer disregarded the dispatcher's orders
for the meeting point apparently with the full knowl-
edge of the other members of the crew as the con-
ductor and the head brakeman were riding on the
engine, and copies of the train orders as to the meet-
ing point were found on the persons of the engineer
and the conductor when their bodies were removed
from the wreck."

In *Kendrick* v. *Chicago, E. & I. R. Co.*, 188 Ill. App.
172, plaintiff's intestate, an engineer, was killed while
running an engine and train at high speed over a
point in the road where he had been warned that the
track was rough and was ordered to reduce the speed
of his train to ten miles an hour. In that case the
court said: "He knew of the danger arising from the
roughness of the track and when he, in disobedience
of his orders, negligently and recklessly approached
said place at a speed of between sixty and seventy
miles an hour and ran over it at a speed of forty-five
miles an hour, he assumed the risk and hazard of so
doing."

In *Ellis' Admr.* v. *Louisville etc. Ry. Co.*, 155 Ky.
745 (160 S. W. 512), plaintiff's intestate, a flagman of
a work train, was sent out to flag trains west of a
bridge under repair. It was his duty to flag east-
bound trains. He was run over and killed by a west-
bound train. In that case the court said:

"When a flagman is sent out to watch for trains
and warn them of danger, the company and its train-
men have a right to presume that he will not only
watch for trains, but also for his own safety, and his
failure to do this is his own negligence, and he cannot
recover of the company for an injury which he re-
ceived by reason of his neglect, unless his presence
and peril were discovered by those in charge of the

train in time to avoid striking him, by the exercise of ordinary care.''

In *Great Northern R. Co.* v. *Wiles*, 240 U. S. 444 (60 L. Ed. 732, 36 Sup. Ct. Rep. 406), plaintiff's intestate was a rear brakeman on a freight train which had broken in two, due to a draw-bar pulling out of one of the cars, causing the train to stop instantly. It was his duty to immediately go back and protect the rear of his train. Instead of performing that duty he remained in the caboose where he and the conductor were both killed by a following fast passenger train, of which he had notice, running into his caboose. The night was dark, and at the place of the collision the track was obstructed by a very sharp curve and a bluff, preventing the rear end of the freight train from being seen more than five box-car lengths away. The engineer of the passenger train did not know of the existence of the freight train ahead and no negligence was attributable to him. The opinion states: ''What caused the pulling out of the draw-bar, was not shown, nor was there any proof that it was defective or that the company was negligent in the care or use of it.'' The conclusion of the court is stated in the opinion as follows:

''There is no justification for a comparison of negligences or the apportioning of their effect. The pulling out of the draw-bar produced a condition which demanded an instant performance of duty by Wiles,— a duty not only to himself, but to others. The rules of the company were devised for such condition and provided for its emergency. Wiles knew them, and he was prompted to the performance of the duty they enjoined (the circumstances would seem to have needed no prompting) by signals from the engineer when the train stopped. He disregarded both. His fate gives pause to blame, but we cannot help pointing out that the tragedy of the collision might have been

appalling. He brought death to himself and to the conductor of his train. His neglect might have extended the catastrophe to the destruction of passengers in the colliding train. How imperative his duty was is manifest. To excuse its neglect in any way would cast immeasurable liability upon the railroads, and, what is of greater concern, remove security from the lives of those who travel upon them; and therefore all who are concerned with their operation, however high or low in function, should have a full and anxious sense of responsibility.

"In the present case there was nothing to extenuate Wiles's negligence; there was nothing to confuse his judgment or cause hesitation. His duty was as clear as its performance was easy. He knew the danger of the situation and that it was imminent; to avert it he had only to descend from his train, run back a short distance, and give the signals that the rules directed."

In the case of *Ingram* v. *Atlantic Coast Line R. Co.,* 181 N. C. 491 (106 S. E. 565), plaintiff's intestate, a brakeman, was killed by being crushed between the engine and cars left by him on a storage track without sufficient clearance between the cars so left and the track on which the engine was backing, while he was riding on the tender and giving signals to the engineer as to the movement of the engine. It was held that as his death "was caused solely by the failure on his part to perform the duty which had been intrusted to him alone" a recovery cannot be sustained under the Employers' Liability Act. In that case the court distinguished that case from the case of *Railroad* v. *Skaggs,* 240 U. S. 66 (36 Sup. Ct. Rep. 249), as follows:

"In *Railroad* v. *Skaggs,* 240 U. S. 66 (36 Sup. Ct. 249, 60 L. Ed. 528), an authority relied upon by the plaintiff, the plaintiff, a brakeman, was crushed between two cars because one had been left too near the

track, and a recovery was sustained, but upon the ground that there was another brakeman connected with him in the operation of the train, and that the evidence supported the contention of the plaintiff that his injury resulted from the negligence of a fellow-servant, but the court says in the course of the opinion: 'The statute does not contemplate a recovery by an employee for the consequences of action exclusively his own.' ''

Where the injury is solely the result of the employee's negligence, there can be no recovery under the federal Employers' Liability Act: *Great Northern R. Co.* v. *Wiles,* 240 U. S. 444 (60 L. Ed. 732, 36 Sup. Ct. Rep. 406, see, also, Rose's U. S. Notes); *Grand Trunk W. R. Co.* v. *Lindsay,* 233 U. S. 42 (Ann. Cas. 1914C, 168, 58 L. Ed. 838, 34 Sup. Ct. Rep. 581); *Illinois Central R. Co.* v. *Skaggs, supra; Virginian R. Co.* v. *Linkous, supra; Ellis' Admr.* v. *Louisville etc. Co., supra; Pankey* v. *Atchison T. & S. etc. Co.,* 180 Mo. App. 185 (168 S. W. 274); *Fitzpatrick* v. *Hines,* 105 Neb. 134 (179 N. W. 410).

Here the plaintiff's own act, under the testimony, was the sole cause of the injury. It was his act alone that brought about the resultant danger and the consequent damage. His violation of the order was willful and intentional. It was done knowingly, and this was the sole, direct and proximate cause of his injury. There was no intervening or concurrent act of negligence shown on the part of the carrier that in any way produced the injury complained of or contributed to bring it about. He himself created the condition which brought about the danger. No other member of the train crew did any independent act upon which he had a right to rely as a justification for his violation of the order, and it is no answer to say that because the other members of the train crew

108 Or.—8

co-operated or participated with him in operating the
train in violation of the orders of the company, that
their participation with him in the violation of an
order that they were all bound to obey, was the negli-
gence of the carrier. Having brought about this
dangerous condition and the resultant damage to him-
self, he assumed the risk and is not entitled to re-
cover: *Baugham* v. *New York P. & N. R. Co.*, 241
U. S. 237 (60 L. Ed. 977, 36 Sup. Ct. Rep. 592);
*Jacobs* v. *Southern R. Co.*, 241 U. S. 229 (60 L. Ed.
970, 36 Sup. Ct. Rep. 588).

9. In order for plaintiff to recover in this action,
it was necessary for the plaintiff to show that some
negligent act or omission by some officer, agent or
employee of the carrier co-operated or contributed in
some way to bring about the injury complained of.
As the plaintiff has wholly failed to show any such
negligent act or omission, the judgment should be re-
versed and a judgment entered in favor of the defend-
ant, and it is so ordered.

REVERSED AND JUDGMENT ENTERED.

BURNETT and McCOURT, JJ., concur.

McBRIDE, C. J., Dissenting in Part and Concur-
ring in Part.—Upon the main question I agree, with
some hesitation, with the dissenting opinion of Justice
BEAN; but accepting, as I must, the opinion of the
majority that there is error requiring a reversal of
the judgment, there arises a question of procedure
as to the particular judgment that should be ren-
dered. It seems plain to me that a new trial will not
avail the defendant in this case and will only entail
useless expense. It is a case directly appealable to
the Supreme Court of the United States and upon

that question I agree with Mr. Justice RAND that the case should be dismissed.

BROWN and HARRIS, JJ.—We are unable entirely to agree with the opinion written by Mr. Justice BEAN or with the one written by Mr. Justice RAND; and therefore we deem it necessary to explain our views.

The trial judge informed the jury that the construction of train order No. 226 was a question of law for the court, and, acting on that assumption, he advised the jury that the fact that the order

"Was not made to read from Cook to Oswego, the only part of the line included in the order over which train 231 was to pass did not change the effect of said order, nor render it confusing or doubtful of construction"; that the order "gave train 234 the right of way over all that part of defendant's lines of road between Beaverton and Oswego, and the plaintiff and others in charge of train 231 should have so construed it and remained at Oswego until train 234 arrived;" that "under said order it then became the duty of those in charge of said train to have stopped at Oswego and held said train there until 234 had arrived and passed on, and if said employees in charge of said train and all of them forgot said order, disregarded or violated it, and caused said train to proceed out of the yard at Oswego and on its way south or if they misconstrued or misinterpreted said order and proceeded as herein stated, and that it was because of this disobedience, disregard, violation, misunderstanding or misconception of said order that these two trains were caused to come together in collision, and from such collision plaintiff suffered the injury complained of in this case; and you should also find that the conductor, fireman and brakemen on said train,—and who were each equally with the plaintiff responsible for the operation of said train, and could have prevented said train from passing out of said yard at Oswego until 234 had

arrived and passed on; that they had the means of so controlling the operation of said train, and could have held the same at Oswego, then I instruct you that it was their duty so to do and their failure in this regard, or their acquiescence in the train's departing from Oswego under the circumstances under the federal Employers' Liability Act would be an act of negligence, for the consequences of which the defendant company would be responsible.''

It will be observed that the foregoing instructions absolve the defendant from any negligence as to the form of the order; that the jury was told that order No. 226 was plain and not doubtful as to its meaning and that under the order it was the clear and absolute duty of those in charge of train No. 231 to hold it at Oswego until the arrival of train No. 234; and that if the conductor, fireman and brakeman had the means of controlling the operation of train No. 231 and could have held it at Oswego and did not do so, or if they acquiesced in the departure of the train from Oswego, their conduct was negligence for which the defendant is liable. The uncontradicted evidence is that the fireman could have stopped the train; and furthermore the unquestioned testimony is that the caboose, in which the conductor and brakemen rode was so equipped that the conductor or any one of the brakemen could have stopped the train. The plaintiff affirmatively stated and reiterated that when he left Oswego he had order No. 226 in his mind and that he had not forgotten it. Aside from the inferences that may be drawn from their conduct, the record is utterly silent as to what interpretation the fireman or the conductor or any of the brakemen on train No. 231 placed upon order No. 226; and the record is likewise devoid of direct testimony as to what those members of the crew, except Davis and the con-

ductor, did or omitted to do. There is no evidence
of the acts of the conductor of train No. 231 at Os-
wego, except the testimony of Davis, which was to the
effect that Davis and the conductor checked the register
together at Oswego, and that the conductor gave
Davis a signal to proceed. The conductor of train
No. 231 was subpoenaed by the plaintiff and called
as a witness by the defendant; but apparently neither
side was willing to run the risk of asking any ques-
tions other than such as were necessary to elicit
the information that he was the conductor of train
No. 231, that he had been subpoenaed by the plaintiff,
and that he was no longer employed by the Southern
Pacific.

In these circumstances the instructions, to which at-
tention has been directed, amounted to a direction to
the jury to return a verdict for the plaintiff. The in-
structions now under examination assume: (1) That
order No. 226 was plain and proper and that it in
no wise involved negligence on the part of the de-
fendant; (2) that under this order it was the positive
duty of the train crew to hold train No. 231 at Os-
wego until the arrival of train No. 234; (3) and that
failure so to hold the train, whether resulting from
disobedience, disregard, misunderstanding, forgetful-
ness, or misconception of order No. 226 on the part
of the train crew, was negligence on the part of every
member of the crew and that the defendant was liable
for all of that negligence except the negligence of
Davis. If, as we read the record it contained no
elements except the ones last mentioned, we would
agree with the conclusion reached by Mr. Justice
RAND.

State courts, are of course, controlled by whatever
construction the Supreme Court of the United States
has placed upon the federal Employers' Liability Act.

The plaintiff and the defendant differ sharply in their contention as to the construction given to the act by the national Supreme Court. If any member of the train crew had violated some duty imposed upon him alone, and that act of violation was one of the contributing causes of the collision, then the question of the liability of the defendant would, under the decisions of the Supreme Court of the United States, be free from difficulty; but the writers do not understand that any decision of the Supreme Court of the United States thus far reported gives support to the notion that if two employees are each bound to perform exactly the same specific duty and both the right and the obligation of each to perform that single specific duty is equal to the right and obligation of the other, each one of those two who acting in concert with each other and each acquiescing in the conduct of the other violates that single duty, which though single was nevertheless imposed upon all and therefore was common to all, can recover from the railroad company. To allow any one of such two or more employees to recover would be equivalent to holding that each of such two or more employees, though having acquiesced in the conduct of each other and though having acted in concert, can say to the employer: Although I was hurt because I failed to perform my specific duty you are nevertheless liable for damages to me because another employee, acting in concert with me and with my acquiescence, failed to perform my duty for me. If, reasoning inductively, we may draw a general conclusion from "single instances," including particularly *Virginian Railway Co.* v. *Linkous,* 230 Fed. 88 (144 C. C. A. 386), 235 Fed. 49 (138 C. C. A. 543); and *Linkous* v. *Virginian Railway Co.,* 242 Fed. 916 (155 C. C. A. 504), the writers are led

to the conclusion that on the facts thus far assumed to exist the plaintiff cannot recover. In *Linkous* v. *Virginian Railway Company* the material facts were peculiarly like the controlling facts in the instant case; and there the Circuit Court of Appeals of the Fourth Circuit affirmed the judgment of the district court directing a verdict for the defendant Virginian Railway Company, and the Supreme Court of the United States denied the petition of the plaintiff for a writ of *certiorari*, thus affirming the judgment: 242 U. S. 630, (61 L. Ed. 537, 37 Sup. Ct. Rep. 15).

If the conclusion that on the facts thus far mentioned the plaintiff cannot recover is correct and if these were in truth the only facts, or if the record contained no evidence of any additional facts, then a reversal without a new trial ought to be the result. But as the writers read the record there is evidence sufficient to entitle the plaintiff to have submitted to the jury the question as to whether or not the defendant was negligent in giving order No. 226 and as to whether or not a different order or a supplemental order ought to have been given.

It will be helpful if, before attempting to ascertain whether there was any evidence tending to show negligence on the part of the defendant, we first describe the course of the Southern Pacific lines so far as they are material here and also give a detailed account of what was done by Davis and the conductor of 'train No. 231.

Going from Portland the general direction of all Southern Pacific lines in Oregon is south. The Union depot at Portland is on the west side of the Willamette River. Several lines lead out of the depot, but we need notice only two of them. One line crosses the Willamette River at Portland, proceeds

about four miles to Brooklyn then two miles to Willsburg and thence to San Francisco. This is known as the main line. At Willsburg a branch line leaves the main line, crosses to the west side of the Willamette River and proceeds to Wilsonia. The other line leading out of the Union Depot follows along the west side of the Willamette River the entire distance to Wilsonia. The two lines join at Wilsonia and there become a single line of track. This single line of track continues from Wilsonia to and through Oswego and thence to Cook where the single line again branches into two lines. If one takes the right-hand branch leading out of Cook, he will go through Beaverton and thence to St. Joseph. If one takes the left-hand branch he will pass through Newberg and thence to St. Joseph where the right-hand and left-hand branches are again united and continue as a single track on south to McMinnville and thence to Corvallis.

Train No. 234 was a local freight running north from McMinnville to Portland. This train upon reaching the junction at St. Joseph took the branch that passes through Beaverton and thence ran to the junction of the two branches at Cook and thence over the single track leading to Oswego. The ultimate destination of train No. 234 was Brooklyn. Train No. 231 was a freight running from Brooklyn to Corvallis. Leaving Brooklyn this train passed over the main line to Willsburg where it left the main line and took the branch to Wilsonia and thence it ran to Oswego. This train was supposed to run to Cook and then to take the left-hand branch and proceed south through Newberg and on to St. Joseph and thence through McMinnville to Corvallis. Thus it is seen that between Wilsonia and St. Joseph the routes of

the two trains took them over separate tracks except
for a distance of four and one-half miles between
Cook and Wilsonia, and at no point between Wilsonia
and St. Joseph was it possible for the two trains
to collide except between Cook and Wilsonia.

The plaintiff reported at Brooklyn for work on
May 31, 1918, at about 9:20 A. M. He registered
and checked "over all trains that had arrived or de-
parted within the last twelve hours." While oiling
his engine Davis received from the conductor "the
orders concerning us on this trip." Train No. 16
ran on the main line; it was coming from the south
and was more than three hours late. Davis testified
that No. 16 "was the only train I had been able to
check against on the register which had not arrived
within the allotted space of time." The plaintiff as
engineer received only two train orders on that day
and those two were received from the conductor at
Brooklyn. One of the two orders related to train
No. 16; and this order was a "time order" and gave
train No. 231 "plenty of time to reach" Willsburg
before the arrival of train No. 16. The other order
was No. 226. Train No. 234 when on schedule time
reached Brooklyn several hours before the scheduled
departure of train No. 231; and consequently a
period of several weeks might elapse and the crew
of No. 231 would not even see train No. 234. But
on May 31, 1918, train No. 234 was, as already stated,
late. Davis admitted that he knew that train No.
234 had not arrived at Brooklyn prior to the departure
of train No. 231, because "if that train had reached
Brooklyn he would not have received that order."
Davis showed order No. 226 to his fireman. The
train crew was composed of six men: the plaintiff, as
engineer, a fireman, a conductor, and three brakemen.

Train No. 231 left Brooklyn, proceeded to Willsburg where it left the main line, and then ran to Wilsonia. Upon arriving at Wilsonia, but before going upon the single track leading towards Cook, in compliance with a rule requiring all trains "before entering this point of track here to call up the dispatcher and get permission to proceed or stay at this point until such time as the dispatcher gives you the authority to move," the dispatcher was "called up and he said 'follow No. 355' which was one of the fast red trains" which leave the Union Depot and run south on the line which follows the west side of the Willamette River to Wilsonia.

Half a mile south of Wilsonia is Oswego, a station on the single track. A day and night telegraph operator, a train register, and a train order signal semaphore are at Oswego. Upon receiving the order of the dispatcher to "follow No. 355," train No. 231 proceeded from Wilsonia to within a short distance of the station at Oswego when Davis whistled for the semaphore and thereupon "this signal was cleared." The train then proceeded to the freight-house and there stopped. After oiling the engine Davis walked back to the office for a drink of water and while there "the conductor said, 'While you are here, Walter, let's check these registers, the train order registers'; which I did. We checked it against all trains which concerned us. The limited space between 355 being up, being ten minutes, our work being finished, I got to the engine and I asked the conductor if all was set. And he said, 'High-ball,' and we pulled out."

Rule No. 83B prescribes that engineers shall before leaving register stations require from the conductor a card showing all superior trains and stating that he has checked the register and that they have all arrived or departed as the case may be. The plaintiff

testified that this rule was not observed at Oswego for the reason that ''I was there and checked it in person with him.'' The plaintiff also testified that he and the conductor checked the register together ''personally, by the time-table,'' but that he did not check against train No. 234 because he did not think that it affected his train. It must be conceded that the record contains evidence of negligence on the part of the plaintiff. But, can it be said as a matter of law that there was no substantial evidence of negligence on the part of the defendant which operated as a contributing cause of the collision which occurred when train No. 231 and No. 234 collided at a point a half a mile or a mile south of Oswego? The plaintiff alleged, among other things: That the defendant was negligent

''in not giving said order to the plaintiff at Oswego instead of at Brooklyn''; that order No. 226 ''did not comply with the rules of the carrier in that the said order named towns off of the line from which plaintiff's train ran''; and ''in that said order did not apprise plaintiff of the position of said train No. 234''; and ''in not giving a meet order requiring the plaintiff's train No. 231 to be held at Oswego until train No. 234 arrived there.''

Let us inquire whether there was any evidence that order No. 226 was itself defective. Although the general direction of Southern Pacific lines in Oregon is south and north, in the language of railroad men trains going south are known as west bound and those going north as eastbound. West-bound trains, or those going south, when operating according to timetable, have superiority over those going north or eastbound; and this superiority can be changed only by a train order. In the absence of a train order, therefore, train No. 231 was superior to and had the

right of way over train No. 234. Train orders, so far
as they are material here, are of three kinds: (1)
Meet; (2) wait; and (3) right of way. In the case
of a meet order, both opposing trains receive the
order and the agent at the meeting place, if there be
such an agent, also receives a copy of the order; and
so, too, in case of a wait order, the agent, if any there
be at the waiting point, receives a copy of the order.
This is required by rule No. 208, which in part reads
as follows:

"A train order to be sent to two or more offices must
be transmitted simultaneously to as many of them
as practicable. The several addresses must be in the
order of superiority of trains, and when practicable
must include the operator at the meeting or waiting
point, each office taking its proper address. * * Copies
of the order addressed to the operator at the meet-
ing or waiting point must be delivered to all trains
affected until all have arrived from one direction."

But in the case of a right of way order, the two
opposing trains receive the order and no copy is sent
to an intermediate point. A right of way order
simply gives to one train the right over another train
to the use of the track, or, as expressed by one of the
witnesses it transfers superiority of right from one
train to another. When a meet or a wait order is
issued the operator at the meeting or waiting point
gives the order which he has received from the dis-
patcher to the first of the two opposing trains which
arrives, and he keeps the semaphore at a stop or nor-
mal position and does not clear the semaphore until
all opposing trains have arrived or departed; and
consequently the first arriving train cannot proceed
until all opposing trains have arrived, without run-
ning "against the board." But, since in the case of
a right of track order a copy is not sent by the dis-

patcher to an intermediate point, no agent or operator at any station has a copy of that order; and consequently when the inferior train whistles for the board the operator not having an order for that train, clears the board, with the result that the train can proceed without running "against the board." There is a very material difference between a right of track order and a meet or a wait order. Giving, for example, train No. 1 the right of track between Station A and Station C over train No. 2, according to the uncontradicted testimony of Morris, the Southern Pacific trainmaster and of Dickey, the conductor of train No. 234, does "not necessarily" oblige train No. 2 to wait at Station C until train No. 1 arrives from Station A; for if train No. 2 can proceed and reach Station B, an intermediate point, before train No. 1 arrives there, it may do so; or if train No. 2 can continue on to Station A and "clear" the time of No. 1, it may even do that. In the instant case, however, train No. 234 was several hours late and was not running on schedule time. Davis had no such information concerning the time or whereabouts of train No. 234 as he had concerning train No. 16, except such information as was conveyed to him by order No. 226. He was informed that No. 16 was more than three hours late and that he would have ample time to get to Willsburg, but no such information was given as to train No. 234.

The essential difference between a meet order and a right of track order is that a meet order absolutely requires a stop and a wait until the arrival of the opposing train, while a right of track order permits the inferior train to go on if it can reach the next station in time to clear the track for the opposing train. Rule No. 201 reads as follows:

"For movement not provided for by time-table, train orders will be issued by authority and over the signature of the superintendent. They must contain neither information nor instructions not essential to such movements."

According to the testimony of G. C. Morris, the trainmaster, and of C. R. Baker, the division examiner of the Southern Pacific, order No. 226 was a "technical" violation of rule No. 201. Morris stated that, while the order is as he contends clear, it should have read Cook to Oswego without making any reference to Beaverton. Davis said that in all of his twenty years' experience he had never seen an order like No. 226; and Baker, the division examiner, who hires the men, examines them on the rules, promotes conductors and engineers, and interprets the rules, testified that he had never before seen an order like order No. 226 "reading over a certain piece of territory that a train was not scheduled over."

The testimony of Morris contains some enlightening information. He had been in the service of the Southern Pacific Company about thirty-five years. He had run trains and had been an operator, an agent, a dispatcher and a chief dispatcher before becoming trainmaster. The testimony of this witness is susceptible of material inferences available to the plaintiff. The testimony is as follows:

"Ordinarily the orders are given like this, for instance, a train inferior by direction is coming in off the line, the meeting point is uncertain owing to the fact that there is work to do at different stations, possibly, so they will put out an order in many cases giving the right over to a certain point, figuring that later on they will be able to fix up the meet which will be beyond that point yet. Now, I don't know of course what the idea would be in this case, but it was probably that when the dispatcher first started to put

out his orders that he wasn't sure what time 231 would get out of Brooklyn, possibly that was the reason that he put out that order. If he knew definitely what time they were going to get out he would probably have put a meet order at some other point, or at that same point. But my position is that if I was handling the trains that is the way I would do it, I would move them along until I could get them to a meeting point."

The defendant claims that order No. 226 required train No. 231 to wait at Oswego until the arrival of train No. 234. If order No. 226 required a wait at Oswego when train No. 231 arrived there, it necessarily involved the same requirement when the train left Brooklyn. Train No. 234 was not running on schedule. Davis was not apprised of its whereabouts or of its time. He knew that the scheduled route of that train was through Beaverton; and order No. 226 not only confirmed that knowledge but impliedly stated that at the time of the issuance of order No. 226 train No. 234 had not yet left Beaverton. Davis says that if the order had read Cook to Oswego it would have apprised him "where 234 was." Furthermore, Davis saw No. 355, the fast red train, pull out of Oswego on its way to Cook and, for aught that appears in the record, this may have been to him a complete demonstration that train No. 234 had not yet arrived at Cook, or at least had not yet left Cook, which was only four miles away. Davis knew no more about train No. 234 when he reached Oswego than he did when he left Brooklyn, except that he must have known that it was probably nearer Oswego than it was when he left Brooklyn. If order No. 226 spelled "wait at Oswego" when Davis arrived at Oswego, it spelled "wait at Oswego" when he left Brooklyn; and if it did so spell "wait at Oswego" so far as the

present condition of the record is concerned, notwithstanding the contention of the defendant that order No. 226 was a right of track order and not a wait order or a meet order, and therefore did not require a "middle" order to the operator at Oswego, there is room for argument that under rule No. 208 Oswego became a waiting point to which a "middle" order should have been sent.

No witness said that order No. 226 was in full compliance with the rules; but upon the contrary, the two witnesses, Morris and Baker, who above all others ought to know the correct construction of the rules, admitted that the order was a "technical" violation of rule No. 201. Any one of the six men composing the crew of train No. 231 possessed authority to stop it and could have stopped it and prevented it from leaving Oswego if order No. 226 required the train to wait at Oswego; and yet those six men left Oswego without an attempt upon the part of any one of them to prevent a departure of the train. The very fact that six men did this is not without significance. Order No. 226 was the only order which affected that crew of six men at Oswego, and if it be assumed that it was a right of track order and not a wait order, then it was an order which entitled train No. 231 to proceed if it could have cleared the time of the other train. But the crew of train No. 231 did not know the time of the other train, because it was hours late. It may be that the defendant ought at all events, as it is possible to infer from the testimony of Morris, to have issued a wait or a meet order supplementing order No. 226, and it may be that this duty, if it was a duty, became enlarged and urgent because of the violation of rule No. 201 by the wording of order No. 226. It cannot well be denied that it would have

been practicable to issue a meet order; for at Oswego there was an operator and a semaphore. It must be conceded that if a meet order had been issued the board would not have been cleared for train No. 231 when it pulled into Oswego and it could not, without running against the board, have left Oswego before the arrival of train No. 234. Furthermore, if a copy of order No. 226 had been sent to the operator at Oswego and if he had interpreted the order to mean "wait at Oswego for train No. 234," as the defendant contends the order must be interpreted, the operator would not, according to the testimony of Dickey and Baker, have cleared the board until the arrival of train No. 234.

The stubborn fact remains that if a meet order had been issued or if a copy of order No. 226 had been sent to the operator at Oswego and he had interpreted it as the defendant does, the collision would not have occurred. Whether the defendant was negligent in not issuing a meet or a wait order or otherwise acting is a question of fact for the jury. There is sufficient evidence to enable the plaintiff to carry that question of negligence to the jury. If the defendant was negligent and such negligence contributed to the collision then to that extent the defendant is liable to the plaintiff.

In our view the judgment ought to be reversed and the cause remanded for a new trial.

BEAN, J., Dissenting.—This is an action for damages for personal injury, brought under the federal Employers' Liability Act. The cause was tried to the court and a jury, resulting in a verdict and judgment in favor of the plaintiff for the sum of $25,000. Defendant appeals.

108 Or.—9

The plaintiff, Walter Davis, was engineer on train
No. 231 southbound, or westbound in railway par-
lance, on the Southern Pacific lines from Portland
by way of Oswego and Cook to Corvallis. Knight,
who was killed in the collision, was engineer on train
number 234 northbound, or eastbound in railway
parlance, from Beaverton by way of Cook and Os-
wego to Portland. Beaverton is situated about seven
miles off the line traversed by train number 231 from
Portland to Corvallis. The two trains necessarily
used the same track from Cook to Oswego and thence
to Portland.

The plaintiff, as a basis for his action, alleges in
his complaint substantially as follows:

"That the plaintiff herein, a former employee of
the Southern Pacific Company, was employed on and
prior to May 31, 1918, as engineman on the lines of
the Southern Pacific Company by the director general
of railroads; that for a long time prior to said date
said plaintiff had been in the employ of the director
general of railroads as an engineman on trains car-
rying freight running over the Southern Pacific Lines
of railroad and more especially from Portland, Ore-
gon, to Corvallis, Oregon, and particularly over the
line of railroad hereinbefore mentioned and described;
that said train hauled by the plaintiff as engineman
on May 31, 1918, consisted of an engine, freight cars
and caboose, and carried freight from the states of
Washington, Idaho, Montana, Wyoming and other
states in the United States through and into the
states of Oregon and California, and said train at
said time was engaged in interstate traffic and was
hauling cars and freight that came from other states
than the state of Oregon, and the same were being
operated over a common carrier line and carried at
said time freight from outside the state of Oregon
to points within Oregon and in the state of Cali-
fornia; that the said railway line over which plaintiff
operated said train as aforesaid extended from Ore-

gon to California and was used for the purpose among other things of carrying interstate traffic.

"That on May 31, 1918, the director general of railroads, through his officers and agents, directed the plaintiff herein to proceed with engine No. 2512 from Portland, Oregon, to Oswego, Oregon, by way of Cook, to Corvallis, Oregon, and to haul with the said engine over said line two loaded cars, one empty car and a caboose, which cars were cars used in carrying freight from points outside the state of Oregon, from other states, to points within the state of Oregon and within the state of California; that said cars at said time were hauling freight from points in states outside of the state of Oregon to points within said state of Oregon; that said train was what was known at said time as West Bound Local Freight No. 231; that plaintiff's said train was directed to leave Brooklyn Yards, Portland, Oregon, at 9:45 A. M. on May 31, 1918, and did in conformity with said directions leave said yards at said time; that before leaving the director general of railroads, through his agents, servants and employees caused to be delivered to Engineman Davis, plaintiff herein, and to Conductor Frederickson, conductor of said train, Order No. 226, which order read as follows: 'No. 234, engine 2911, has right of way over 231 Beaverton to Oswego.' That before leaving the railroad yards at Brooklyn, Portland, Oregon, and at the time Order No. 226 was given to plaintiff herein, plaintiff showed said order to his fireman, who read the same; that Conductor Frederickson was at the said time given a copy of said order; that under said conditions plaintiff proceeded with said train over the lines of the Southern Pacific Company to Oswego, Oregon, where plaintiff in company with the conductor of said train checked the register and returned to his place in the engine cab; that at Oswego at said time another train, known as an electric train, was being run by the director general of railroads over the same line on which plaintiff was operating his said train; that by reason of the fact that said electric train left Oswego before train No. 231, under the rules and regulations then

in force, it was necessary for plaintiff to remain at Oswego for the period of ten minutes; that at the expiration of the said ten minutes Conductor Frederickson negligently and carelessly gave the order for plaintiff to proceed with said train on the way toward Corvallis over the line of railroad as hereinbefore described; that in compliance with the said order and direction plaintiff herein started on the way toward Corvallis over the said line of railroad; that said train was then and there equipped with an air brake system, consisting of compressed air pumps, chambers, cylinders, reservoirs, pipe-lines and valves, rods, hangers and brake shoes, which system extended from the engine at the front end of said train to the caboose at the rear end thereof, and was then and there in working condition and operative, and so arranged and equipped that by the simple and easy movement by a man's hand of a valve (commonly called the conductor's valve) in said caboose, the compressed air contained in said brake system would be discharged into the atmosphere and the brake shoes in said system would thereby be automatically applied to and held against the wheels of the engine, cars and caboose in said train, and thereby instantly stop said train; that either Conductor Frederickson or any one of the three brakemen who were then and there in said caboose could at any moment have instantly stopped said train by moving said valve and thereby automatically applying said brake shoe to said wheels, and they and each of them should have instantly stopped said train when it then and there started to leave Oswego, and if they had then and there so stopped said train, the collision hereinafter referred to would not have occurred; that Conductor Frederickson and each of said three brakemen negligently and carelessly omitted then and there to move said valve and thereby stop said train. That as plaintiff, in operating said train, approached a cut about twelve hundred feet long, the walls of said cut being ten to thirty feet high, plaintiff herein, without any warning whatever from his fireman or the conductor or any of the brakemen or anyone else, came upon freight

train No. 234 approaching at a rate of about twenty miles per hour, said train consisting of about thirty loaded cars, five empty cars and a caboose, hauled by locomotive No. 2911; that the said track at said point was a single line track and the trains were so nearly upon each other that it was impossible for plaintiff to do anything to avert a collision, and the said trains Nos. 231 and 234 came together in a head-on collision with great force at a point about 2.2 miles east of Cook, which is the junction point between the Newberg and Tigard branches of said railroad; that in said collision the plaintiff herein was severely and permanently injured, as more particularly hereinafter set forth; that the force of said collision broke the left cylinder and the frame of locomotive 2512 back to the front drivers, the cab was demolished, the tank frame was broken in two and the trucks bunched near the rear end of the locomotive; the first car in train 231 came to rest upon the top of the tender and was practically destroyed, and locomotive 2911 was greatly damaged and jammed.

"That the carrier, the director general of railroads, his agents, servants and employees, on the 31st day of May, 1918, were reckless, negligent and careless in giving to the plaintiff at Brooklyn, Oregon, Order 226; that said director general of railroads, his servants, agents and employees, were further negligent, reckless and careless in not making said order read: 'Cook to Oswego' instead of 'Beaverton to Oswego,' and in not giving said order to plaintiff at Oswego instead of at Brooklyn; that said order did not comply with the rules of the carrier in that said order named towns off the line over which plaintiff's train ran, and in that said order did not apprise plaintiff of the position of said train No. 234; that said director general of railroads, his agents, servants and employees, were further reckless, negligent and careless in not giving a meet order requiring plaintiff's train No. 231 to be held at Oswego until train No. 234 arrived there; that under said circumstances it was customary to give a meet order where trains were being operated over a single line of track; that

it is and was at said time customary under such circumstances to name only towns on the line over which plaintiff's train ran, and not to name any towns or points not on the line over which plaintiff's train ran; that in this particular, said director general of railroads, his agents, servants and employees, were careless, reckless and negligent. That Rule 752 of the carrier reads:

" 'Conductors and enginemen are required to show their train orders to the brakemen and firemen, who must read and return them, and should there be occasion to do so, they will remind the conductor or enginemen of their contents. Conductors must not verbally inform enginemen of the contents of train orders, but should obtain from them an understanding of all train orders restricting their rights, if practicable, before they are acted upon.'

"That the director general of railroads, his agents, servants and employees, were further negligent and careless in not requiring train 231 to remain at Oswego until train No. 234 arrived, and in giving a clear train order signal at Oswego, Oregon, and in failing to stop the said train by the use of the airbrake system. That each and all of said acts of negligence on the part of the director general of railroads, his agents, servants and employees, was and were the approximate cause of the injuries sustained by plaintiff herein as more particularly hereinafter set forth.

"That on May 31, 1918, at the time of the collision hereinbefore mentioned, said engines and trains came together with such violence and force that the plaintiff received injuries rendering him unconscious for more than twenty-four hours after said collision."

Plaintiff further alleges in detail that he was severely injured, and thereby damaged.

The answer of defendant denies generally the allegations of the complaint regarding the wrongful issuance of orders and the negligence of the defendant. It sets out in a further and separate answer that the

accident in this case was caused solely by the act of negligence of the plaintiff in his failure to ''heed or obey'' the orders which were given to him by the dispatcher of the railroad; that the orders were given in pursuance of the rules of the company; that they were plain and specific and easily understood, and plaintiff must have understood them and disregarded them and simply assumed to advance; and that the accident was caused solely by the negligence of the plaintiff, and therefore there is no responsibility on the defendant to respond in damages to plaintiff. The answer admits the proclamation whereby the director general of railroads assumed control and operation of the lines of the Southern Pacific. For a second further and separate defense defendant sets up that the plaintiff assumed the risk. The reply put in issue the new matter of the answer. At the trial the second defense was eliminated with the assent of counsel for defendant, after a portion of the complaint had been stricken.

The testimony of plaintiff Walter Davis, a man thirty-eight years of age at the time of the accident, tended to show in substance the following: He had lived in Portland, Oregon, most of the time during the last twenty years, and during that time had been engaged as a locomotive fireman and locomotive engineer for the Southern Pacific Company, operating over the main line and branches hauling both passenger and freight trains. In May, 1918, he had been at work on the Corvallis branch of the Southern Pacific hauling both interstate and intrastate freight for about five months. He describes this line as the main line from Brooklyn yards in Portland, the Willsburg cut-off to Wilsonia Junction, the Newberg branch to St. Joseph Junction and on the west side lines to Corvallis. The road carried interstate and intrastate

traffic. At that time he estimated about twenty trains a day operated over the "immediate points," some of them over the east side branch, some over the Beaverton cut-off and some through trains to Corvallis. On the morning of May 31, 1918, the day of the accident, at about 9:20 he arrived at work at Brooklyn. After registering his engine and checking over all trains that had arrived or departed within the last twelve hours he received his engine. Brooklyn, where trains are made up for transportation over the various lines, is about four miles from Union station. The engine was attached to a train of three cars and a caboose by the "herder." While plaintiff was oiling the engine preparatory for the trip the conductor handed him "a late order on account of No. 16, which was the only train I had been able to check against on the register which had not arrived within the allotted space of time." This order allowed them to get out about two miles to Willsburg Junction, a point on the main line to San Francisco. He also states:

"We proceeded to this point and we headed out on this branch line, Willsburg cut-off by the way of Milwaukie and the big bridge over the Willamette River to a point called Wilsonia, which is the junction point. * * It is the rules for all trains before entering this point of track here to call up the dispatcher and get permission to proceed or stay at this point until such time as the dispatcher gives you the authority to move,—which we did in this case this morning, —stopped there, called up, and he said, 'Follow No. 355,' which was one of the fast red trains which go up Fourth street here to points beyond where we were. Half a mile beyond Wilsonia is Oswego, where there is a day and night telegraph office, train register, and train order signal semaphore, and also terminal point for suburban trains. We proceeded up this line to within a short distance of the station (Oswego), blew four short whistles, a signal for the

train order semaphore, and this signal was cleared. After stopping there I had been having a great deal of trouble with this engine—hot boxes and hot point, guides, etc., practically the entire working parts of the engine, on account of being recently overhauled in the shops."

Plaintiff further stated that at Wilsonia:

"We stopped, called up the dispatcher and were told to remain there until No. 355 went by, which we did, and being in the yard limit we were able to follow No. 355, under control, to the depot at Oswego.

"Q. Did you do that?

"A. Yes. We headed out on to the east side branch line, proceeded up the main line under control to within a short distance of the depot and sounded the signal for the train order semaphore signal, received the signal, it was cleared to us, pulled up and spotted our car to the freight house door and stopped. I got down and I went around the engine with my oil can and wrenches making further adjustments after which I walked back to the office for a drink of water. While there the conductor said, 'While you are here, Walter, let's check these registers, the train order register,' which I did. We checked it against all trains which concerned us. The limited space between No. 355 being up, being ten minutes, our work being finished, I got to the engine, and I asked the conductor if all was set. And he said 'High ball' (the witness indicating by a motion of the hand), and we pulled out. Up here four miles from Oswego—

"Q. Now, state whether or not you had a clear board at that time.

"A. Coming into Oswego,—the train order semaphore was against us and I called for the train order semaphore signal with the four blasts of the whistle, which is the rule, and received the signal, which is done by the operator dropping it in an inclined position, which clears us, clears the board and shows that he has no orders for us.

"Q. Now, who operates that semaphore signal?

"A. The telegrapher at Oswego.

"Q. Is he the dispatcher?

"A. No, he is subject to the orders of the dispatcher at Portland."

From Oswego to Cook is approximately four miles. Cook is a junction point for trains operating over the Beaverton cut-off, seven miles, where trains from the west side lines cross over to the east side branch. Train No. 231 proceeded toward Cook about one and one-half miles where it collided with train No. 234.

In regard to the interstate character of the train plaintiff stated to the purport that train No. 231 was a freight train consisting, besides the caboose, of three cars, two loaded and an empty; and further:

"One of the loaded cars next to the engine was a Pere Marquette or a Burlington and Quincy, I don't remember which. They were foreign cars, the merchandise car next to the engine loaded with household goods, mill feed, lumber, groceries, for points for distribution along the line.

"Q. And what car was that?

"A. Pere Marquette I think.

"Q. And what were the other cars that you had?

"A. The car in the center of the train was a system flat T. & N. O. wood rack used for hauling cord wood from stations along the line to Portland. The third car in the train was a foreign gondola, a Pere Marquette or a Quincy, loaded with ties used for repairs along the line which we ran over, and the caboose."

He further testified thus: The track between Cook and Oswego was used for interstate and intrastate trains as a main line. The ties which were a part of the train were to be used for repairing this track. The point of the collision occurred in a heavy rock cut which was timbered and brushy on both sides of the right of way, obstructing the view. Train 234 was a local freight from McMinnville to Portland by

way of Beaverton and Cook, carrying lumber, interstate freight, supplies, grain, hay and wood.

"Q. Do you know whether any of this material was going over to Vancouver, Washington?

"A. Yes, there was air plane material for the mill at Vancouver, Washington."

On cross-examination plaintiff testified as follows:

"Q. You had in your train that day two loaded cars and one empty, didn't you?

"A. Yes.

"Q. Now, as far as the articles,—and you started from Brooklyn and you were going to end your trip at another trip in Oregon?

"A. Yes.

"Q. Your start and your finish were both in Oregon?

"A. Yes.

"Q. And as engineer do you have any personal knowledge of the pieces or individual articles of freight that were in those two cars?

"A. At times.

"Q. Did you know at that date where any of those articles originated?

"A. Not at that date, I didn't.

"Q. Do you know now where any of them originated?

"A. Yes, sir.

"Q. How do you know?

"A. By examining the records.

"Q. You say you have seen something somewhere which gives you that idea?

"A. Yes.

"Q. That some shipment was in there that came from some other state?

"A. Yes.

"Q. But that is the only way, you haven't any knowledge from any other source?

"A. No, sir."

"Q. It wasn't a record that you kept?

"A. No, sir.

"Q. And wasn't a record with which you would have anything to do?

"A. No, sir."

Thereupon counsel for defendant moved the court to strike out the statement of the witness as to what the car contained on the ground that the record referred to by the witness was the best evidence of its contents.

"The Court: From what records did you get that?

"The Witness: From the O. S. D. report at Newberg.

"The Court: Is that an official document?

"The Witness: It is the document kept by their agent at Newberg. * *

"The Court: Was anything of this loaded in Portland?

"The Witness: The car was in our train at Brooklyn, this merchandise car."

The court ruled as follows:

"I think you had a right to assume at the time that he answered that question that the only information that he could have had about that was from the record. You could have made your objection at the time and I will rule so and give you an exception."

On redirect examination plaintiff further testified to the purport, that men were working repairing this interstate track and using ties that he was taking there; that this repair work was going on every day, while he was there. In regard to the load of ties plaintiff stated, in effect, that for several weeks past it had been the "usage" to pick up ties in carload lots and distribute them between certain points, and approximately an hour each way they would unload ties at certain points; that the conductor told him the destination of the ties was Newberg and he could

figure from that they would pick up the ties the next day and unload them between Newberg and Sherwood; that these ties were used continuously; that they needed them at the time; and that they were consigned to the company at Newberg.

Plaintiff describes the collision and his injury in detail. He also testified in effect to the following: Train No. 231 according to the time-table had the right of way over train No. 234 and this would continue except for order No. 226 which, the witness stated, in order to change the rights of way in opposition to the time-table should have read "No. 234 has right over 231 from Cook to Oswego" for the reason that the order covered seven miles of track not on the route of train 231, namely from Cook to Beaverton. The order was "inoperative or ineffective." A meet order should have been issued reading, "No. 234 will meet No. 231 at Oswego," and been put out at Beaverton, Brooklyn and Oswego, or the order issued should have been forwarded to Oswego so that the operator there would not have cleared the semaphore signal. No order was sent to, or received at Oswego, the meeting or waiting point, in accordance with the rule 208. There was an operator there twenty-four hours a day. When a meet order is given the dispatcher puts out a middle order at the meeting place, and he is not allowed to clear that board until all trains in one direction have arrived. Order 226 was a right of track order from Beaverton to Oswego, transferring the rights of the train. The order given was not in effect a meet order. A meet order designates a certain spot that trains shall meet. Right of track order transfers the right of trains. If order 226 had read "Cook to Oswego," when they reached Oswego they should have received a third order which

they did not get. It would seem practicable to send the order to Oswego in accordance with rule 208. The conductor, brakemen and fireman, if they had thought that he had violated the order in leaving Oswego, could have stopped the train. They had equal rights with the engineer in reference to stopping the train, under rule 752, which reads as set forth in the complaint, and also under rule 105, reading:

"Both conductors and enginemen are responsible for the safety of their trains and, under conditions not provided for by the rules, must take every precaution for their protection."

Plaintiff testified that if order No. 226 had been sent simultaneously to Oswego and to train No. 234, the operator at Oswego could have checked back with the dispatcher and ascertained what the order meant as an extra precaution; that if this had been done they would not have gotten the semaphore signal. He further states in answer to the question:

"Q. Why, with this situation, did you go on towards Cook?

"A. I knew that having no further orders for us, concerning us, that the way was clear, and receiving the high-ball from the conductor proceeded on my way."

On cross-examination plaintiff testified in part as follows:

"Q. When you got this order at Beaverton what sort of a form was it on?

"A. Form 31.

"Q. That has a different color from what is known as form 19?

"A. Yes, it is a white order, it is a white order.

"Q. And it is an order which restricts your right, doesn't it?

"A. Not at all times.

"Q. Doesn't that form of order restrict your rights?

"A. It was given to restrict rights, it was given for the meets, it was given for running orders, it was given for a number of different things requiring the signatures of the conductors. * *

"Q. The conductor handed it to you?

"A. Yes.

"Q. And you read it?

"A. Yes.

"Q. Did you have any doubt about its meaning?

"A. No, sir.

"Q. What did you think it meant, just what it said, what did you think it meant?

"A. Train 234 has right over 231 Beaverton to Oswego.

"Q. Did you note the route that train 234 would take, Beaverton to Oswego?

"A. Yes.

"Q. You knew that route would be Beaverton to Cook and Cook to Oswego?

"A. Yes.

"Q. And you knew that your route lay from Oswego to Cook?

"A. Yes.

"Q. And you knew under that route you would traverse the same route of track that 234 would traverse?

"A. Yes.

"Q. And yet you considered that order meaningless?

"A. The order was ineffective and inoperative.

"Q. Why?

"A. It did not mention the stations over which our train traversed. * *

"Q. And yet you tell the jury that that order did not affect you.

"A. No, that order did not affect me, it was not in the regular form. * *

"Q. You had no doubt that it was absolutely meaningless as far as you were concerned?

"A. Yes. * * The form that the order was in nullified it."

The other rules of the railroad, to which attention is called in the testimony, are as follows:

Rule 208. "The several addresses must be in the order of superiority of trains and when practicable must include the operator at the meeting or waiting point, each office taking its proper address.

"When not sent simultaneously to all, the order must be sent first to the superior train.

"Copies of the order addressed to the operator at the meeting or waiting point must be delivered to all trains affected until all have arrived from one direction."

Rule 906. "Enginemen must know their time on the road, and will not start from a station even though they receive a signal from the conductor, unless they can reach the next station in time to properly clear superior trains."

Rule 106. "In all cases of doubt or uncertainty the safe course must be taken and no risks run."

Rule 83 (b). "Enginemen before leaving register stations, except the initial point of their run, will require from the conductor a memorandum on prescribed form showing the numbers of all superior trains, and stating he has checked the register and that they have all arrived or departed, as the case may be."

Mr. G. C. Morris, witness on behalf of defendant, testified in part to the following: He was train-master for the Southern Pacific, and had been in the service of the road for about thirty-five years as operator, agent, dispatcher, and chief dispatcher, and as train-master, and was familiar with the rules of the company. In explaining the difference between a train that is superior by class or direction he stated,—

Class or direction are conferred by the time-table, while right is by train order, "right" is superior. In the absence of any orders train No. 231 had superiority over train No. 234. He was familiar with the route of these trains, and knew that Beaverton was off the line traversed by train No. 231 after it reached Cook. Order No. 226 being read to the witness he stated it was effective on train No. 231, and that between Beaverton and Oswego both of these trains had to traverse the point between Cook and Oswego. Ordinarily in cases of this kind the order would read from Cook to Oswego, but frequently orders cover pieces of track that that particular train does not run over, "in this case * * I see no reason why the order should have read from Beaverton." Where an order is doubtful in its meaning, or unusual in form or peculiar for any reason, the engineer should apply to the proper authorities for construction of the order. Upon being asked why an order of this character is given to a conductor or engineer at Brooklyn instead of at Oswego, and whether it is not the practice to give the orders at a station ahead, he answered, "Well, in orders of this kind it is handled both ways." It is not the practice where a right of way order is concerned to give another so called middle order at another point. Upon cross-examination the witness stated in part thus:

"Q. Rule No. 201 reads as follows, 'For movement not provided for by time-table, train orders will be issued by authority and over the signature of the Superintendent. They must contain neither information nor instructions not essential to such movements.' Now when you give an order covering more space than is necessary you violate that rule don't you?

108 Or.—10

"A. Technically speaking.

"Q. Yes, and isn't that the reason why this order should have read Cook to Oswego?

"A. I said the order should read Cook to Oswego.

"Q. And don't you interpret the orders that come to you under your rules?

"A. Yes.

"Q. Isn't that your kind of dictionary to go by?

"A. Yes, it is."

Upon rule 208 being read to the witness he stated it would not apply to this order "because it is not a meeting or waiting point."

"The Court: Then what became the duty of 231?

"The Witness: 231, if she received no further orders, 234 had been given superiority by train order, they would remain at Oswego until 234 arrived.

"The Court: Would that be the meeting point for those two trains?

"The Witness: They would meet in that case, but it is not a meet order or wait order.

"The Court: Does that word 'Meeting point' in that rule have any other meaning than that place where they are going to meet under the particular circumstances of the case?

"The Witness: I would consider that it was just a case of reversing the rights of the trains and providing for no meeting point at that point.

"The Court: You get a meeting point just the same?

"The Witness: The way it would have worked out in this case it would have been.

"The Court: The way it would have worked out in any case.

"The Witness: Not usually. Ordinarily the orders are given like this, for instance a train inferior by direction is coming in off the line, the meeting point is uncertain owing to the fact that there is work to do at different stations, possibly, so they will put out an order in many cases giving the right over to a

certain point, figuring that later on they will be able
to fix up the meet which will be beyond that point
yet.  Now I don't know of course what the idea
would be in this case, but it was probably that when
the dispatcher first started to put out his orders that
he wasn't sure what time 231 would get out of Brook-
lyn, possibly that was the reason that he put out that
order, if he knew definitely what time they were
going to get out he would probably have put a meet
order at some other point, or at that same point.
But my position is that if I was handling the trains
that is the way I would do it, I would move them
along until I could get them to a meeting point.

"The Court: At the time that the order was issued
it wasn't sure that would be the meeting point or
that there might not be a subsequent order?

"The Witness: Yes.

"The Court: So that you make that distinction as
to meeting point in the ordinary rules and this par-
ticular case?

"The Witness: Yes, exactly.

"Q. If the dispatcher was uncertain as to where
they were to meet, he should have transmitted some
later order, shouldn't he?

"A. Later what?

"Q. I say if the dispatcher at the time that he
gave this order didn't know where he wanted Mr.
Davis to wait, he should have given another order
at some station where there was an operator?

"A. Not necessarily.

"Q. Who would you want to take the risk, Mr.
Davis?

"A. There was no risk to be taken.

"Q. Was Mr. Davis to stay at Oswego until 234
got there?

"A. He could not leave Oswego until all trains
superior to him had arrived.

"Q. There was a waiting and meeting point in
this case?

"A. Not from our understanding of the rules.

"Q. I think a meeting means, waiting for each other and meeting there doesn't it, that is what that phrase means?

"A. Not in our rules as I understand it.

"The Court: It meant wait there, didn't it, until you had orders to go ahead?

"The Witness: For 231 to wait there?

"The Court: Yes, for 231 to wait there.

"The Witness: Yes, it would mean that they would wait there for all trains that were superior to them.

"The Court: Unless he had new orders at Oswego.

"The Witness: He would stay there until they arrived.

"The Court: It would be a meeting point unless he was ordered to the contrary when he got there.

"The Witness: Yes, that would be in this case.

"Q. (Mr. Sheppard): Now was it practicable in this case to send a copy of this order to the operator at Oswego?

"A. It is not required in this case. * *

"Q. That would be another caution wouldn't it?

"A. Well, you might say it would be.

"Q. Yes, if the operator had had this message and understood it the way you understood it now he wouldn't have given a clear board, would he?

"A. If he had orders for that train?

"Q. Yes.

"A. He would not have given the clear board. * *

"Q. Now, the dispatcher violated the rules of the company, especially 201, when he put into this order more space or more information than was necessary, didn't he?

"A. A technical violation, you might say, yes, sir."

C. L. Dickey, conductor on train No. 234 testified to the purport that he received order 226 at Beaverton giving him right of way over 231 to Oswego; that he and his engineer, Mr. Knight, who was killed in the collision understood from the order that they would go to Oswego for 231; that there was no oper-

ator at Cook, there was a telephone there.    On cross-examination the witness stated, referring to the order in question, thus:

"Q. It operated the same as a meet order because the fact is that train No. 231 had to wait at Oswego, didn't it?

"A. It would have the same effect, but it wasn't a meet order. * *

"Q. Well, you know of rules 201 and 208, don't you?

"A. Yes.

"Q. And where trains are to meet at a station, where there is a telegraph operator, the third order must go to the telegraph operator?

"A. Yes. * *

"Q. Well, if the operator had such an order and the operator understood it as you understood it, he never would have given a clear board for Mr. Davis to go, would he?

"A. The operator didn't have anything to do with this order.

"Mr. Sheppard: Read the question to the witness. (Thereupon the question is read.)

"The Witness: No."

C. B. Baker, division examiner for the Southern Pacific Company, testified that order No. 226 was a right of way order; and that he had worked for the Southern Pacific Company about twenty-six years. On cross-examination the witness was asked:

"Q. Now did you ever see an order like this before?

"A. No, sir.

"Q. No, sir?

"A. That is reading over a certain piece or territory that a train was not scheduled over.

"Q. The order should have read, Cook to Oswego, shouldn't it, to be in conformity to your rules?

"A. I cannot see that that would make any difference.

"Q. Answer that question now.
"A. Technically, yes sir."

C. M. Frederickson, called as a witness for defendant, testified that he was a conductor on this train 231; that he had been subpoenaed as a witness for Mr. Davis; and that he was discharged by the Southern Pacific Company. The dispatcher was not called as a witness.

The federal Employers' Liability Act of April 22, 1908, Chapter 149, 35 Stat. 65 (Section 8657 et seq., U. S. Compiled Statutes, 1918) Section 1, provides:

"Every common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories, or between the District of Columbia and any of the States or Territories, or between the District of Columbia or any of the States or Territories and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment."

Section 3 of this act reads:

"In all actions hereafter brought against any such common carrier by railroad under or by virtue of any of the provisions of this Act to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that

the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: Provided, That no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee."

No question is raised as to the liability of the defendant, if the facts of the case bring the action within the federal act.

The trial court, after fully explaining the issues in the case and calling the attention of the jury to the provisions of the act above quoted, among other things charged the jury in substance that the plaintiff in order to sustain the action under the act must prove: (a) that defendant was engaged as a common carrier in interstate commerce; (b) that the accident in whole or in part happened by reason of some act or negligence on the part of the defendant, or some of the officers, agents, or employees of defendant; (c) that the train on which plaintiff was employed was engaged in interstate commerce; (d) and that plaintiff was injured in the accident and suffered damages in consequence thereof. The court defined interstate commerce, and charged the jury in part as follows:

"Therefore, you are instructed that if you should find from the evidence, and the preponderance thereof, that at the time of said accident the cars making up said train or any one or more of said cars contained freight that had originated in some state other than the state of Oregon, destined to a point in the state of Oregon, or to a point in some other state reached by the lines passing through the state of

Oregon, or that said cars or any one of them was carrying freight consigned to said defendant itself which freight was to be used in the repair or reconstruction of the roadbed, railroad lines or terminals of said defendant company, then I instruct you that said defendant company and the train upon which plaintiff was employed would be considered and held as being engaged in interstate commerce at the time of said accident, and you should find accordingly.''

The court further instructed the jury that it was the right and duty of the defendant to formulate, adopt and promulgate rules and regulations for the government, guidance and direction of employees and operatives of its trains, and make them as plain, specific, simple and understandable as the English language would ordinarily permit so that they might be readily comprehended and understood and mistakes thereby reduced to a minimum, and when such rules had been adopted and promulgated it became the duty of the officers, agents and employees of the defendant company having the management, control and direction of the movement of the trains over the defendant's lines to familiarize themselves with such rules and regulations to the end that the operation of such trains might be carried on with as much safety to the employees and the public using them as ordinary care and prudence could provide. The court further charged:

''The order 226 reads as follows: 'No. 234 Engine 2911 has right of way over 231 Beaverton to Oswego.'

''Gentlemen, the Court construing this order in the light of the rules of the Company instructs you,— That it gave train 234 the right of way over all that part of defendant's lines of road between Beaverton and Oswego, and the plaintiff and others in charge of train 231 should have so construed it and remained at Oswego until 234 arrived.

''The Court further instructs you that the fact that said order was not made to read from Cook to Oswego, the only part of the line included in the order over which train 231 was to pass did not change the effect of said order, nor render it confusing or doubtful of construction.

''Under said order it then became the duty of those in charge of said train to have stopped at Oswego and held said train there until 234 had arrived and passed on, and if said employees in charge of said train and all of them forgot said order, disregarded or violated it, and caused said train to proceed out of the yard at Oswego and on its way south or if they misconstrued or misinterpreted said order and proceeded as herein stated, and that it was because of this disobedience, disregard, violation, misunderstanding or misconception of said order that these two trains were caused to come together in collision, and from such collision plaintiff suffered the injury complained of in this case; and you should also find that the conductor, fireman and brakemen on said train,—and who were each equally with the plaintiff responsible for the operation of said train, and could have prevented said train from passing out of said yard at Oswego until 234 had arrived and passed on; that they had the means of so controlling the operation of said train, and could have held the same at Oswego, then I instruct you that it was their duty so to do and their failure in this regard, or their acquiescence in the train's departing from Oswego under the circumstances under the federal Employers' Liability Act would be an act of negligence, for the consequences of which the defendant Company would be responsible. * * If you should find from the evidence and from a preponderance thereof, that this accident which resulted in the injuries suffered by plaintiff was caused in whole or in part by the negligence of the conductor, fireman, or brakemen, even though they are co-employees or fellow servants with the plaintiff, their negligence would under the act be the negligence of the Company, and render the

Company liable in damages to the plaintiff for the injuries suffered. * *

"If you should find from the evidence and from a preponderance thereof that the failure to observe order 226 and hold said train at Oswego until train 234 had arrived and passed, was due solely to the negligence of the plaintiff and that the conductor, fireman and brakemen did not aid, advise, encourage, assist or acquiesce in the acts of the plaintiff in moving said train out of the yard and to cause it to proceed on its journey and that they were unable to prevent the movement of said train by protecting or giving of signs or signals or the use of any other means or appliances, then at hand, by the use of which said train could have been stopped, then I instruct that said accident would be held to be the result of the negligence of the plaintiff alone and would not be held to have been caused in whole or in part by the acts of the defendant, its officers, agents or employees, and if you so find, your verdict should be for the defendant."

The court charged the jury that under the federal Employers' Liability Act contributory negligence on the part of plaintiff is not a defense and should not be held to bar a recovery, but such contributory negligence should be taken into account to diminish the damages they might find plaintiff suffered, if they found any, in proportion to the amount of negligence attributable to the plaintiff; that the engineman was one of the crew in charge of the train and under the rules and orders of the defendant was as much responsible for its movements and safety as were the conductor, brakemen and fireman, and any violation, disregard, disobedience to, misreading, misconstruction, or misinterpretation of the orders to him from the company for the operation of the train would be contributory negligence on the part of plaintiff and such as they should take into consideration to dimin-

ish the amount of damages, if any they found plaintiff had suffered.

The federal Employers' Liability Act nullifies as a defense the "fellow servant" doctrine. Contributory negligence on the part of plaintiff no longer defeats the action, but in certain cases, reduces the liability. Contributory negligence on the part of an interstate carrier by railroad, of a proximate causal nature occasioning injury to its employee, while both the carrier and employee are engaged in interstate commerce, renders the carrier liable although the act of the plaintiff employee may have contributed to such injury.

At the close of the testimony defendant requested the court to direct the jury to return a verdict for defendant, and predicates error upon the refusal of the court so to do. This we think raises the pivotal point in the case. It is contended on the part of defendant that the action of plaintiff Davis in failing to heed order No. 226 was willful and reckless and precludes his recovery; and that there was no negligence on the part of defendant. The inquiry is: Did plaintiff's injury result in whole or in part from the negligence of any of the officers, agents or employees of the defendant carrier as alleged in the complaint? If plaintiff's negligence was the sole cause of the accident, and the negligence of the other employees of the defendant did not contribute thereto, plaintiff cannot recover.

Borrowing the language of Mr. Justice HUGHES, in *Illinois Cent. R. R.* v. *Skaggs,* 240 U. S. 66, 69, 70 (60 L. Ed. 525, 36 Sup. Ct. Rep. 249):

"It is contended that the state court erred in permitting a recovery under the federal statute for the reason that the injury resulted from Skaggs' own act, or from an act in which he participated. The company, it is said, 'cannot be negligent to an em-

ployee whose failure of duty and neglect produced the dangerous condition.' It may be taken for granted that the statute does not contemplate a recovery by an employee for the consequences of action exclusively his own; that is, where his injury does not result in whole or in part from the negligence of any of the officers, agents or employees of the employing carrier or by reason of any defect or insufficiency, due to its negligence, in its property or equipment. April 22, 1908, 35 Stat. 65. But, on the other hand, it cannot be said that there can be no recovery simply because the injured employee participated in the act which caused the injury. The inquiry must be whether. there is neglect on the part of the employing carrier, and, if the injury to one employee resulted 'in whole or in part' from the negligence of any of its other employees, it is liable under the express terms of the act. That is, the statute abolished the fellow-servant rule. If the injury was due to the neglect of a co-employee in the performance of his duty, that neglect must be attributed to the employer; and if the injured employee was himself guilty of negligence contributing to the injury the statute expressly provides that it 'shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee.' See *Second Employers' Liability Cases,* 223 U. S. 1, 49, 50 [38 L. R. A. (N. S.) 44, 56 L. Ed. 327, 33 Sup. Ct. Rep. 169, 1 N. C. C. A. 875, see, also, Rose's U. S. Notes]; *Seaboard Air Line* v. *Tilghman,* 237 U. S. 499, 501 [59 L. Ed. 1069, 35 Sup. Ct. Rep. 653]. We think that the argument for the plaintiff in error overlooks the inferences of fact which the jury was entitled to draw. Thus, the jury could properly regard the two brakemen as asssisting each other in the movement in question. . Such assistance was certainly appropriate, if not absolutely necessary. The very purpose of having two brakemen was not to put upon either the entire responsibility."

The testimony indicated, and the jury could reasonably find, that at Oswego the conductor and engineer checked the register against all trains that they could and made an honest endeavor to ascertain if the way was clear for them to proceed with the train, but that each member of the train crew was negligent in failing to obey order No. 226, although the same was technically defective. The jury in the light of the evidence could not reasonably find that the action on the part of the engineer or conductor in leaving Oswego was willful, or that either of them intended any wrong. At Wilsonia, the station before reaching Oswego, the engineer had been told over the telephone by the dispatcher, as he stated and it is not disputed, to follow passenger train No. 355. They followed this passenger train to Oswego, and were still following it when the accident occurred. After the conductor and engineer checked the register at Oswego the plaintiff went to his engine and asked the conductor "if all was set," and the conductor gave him the "high ball," or sign to go ahead. It is a matter of general knowledge that in the management of trains the conductor invariably gives the signal for the engineer to start the train. It might well be assumed by the jury that such a long established custom is sanctioned by the officers of the railroad company. Although the engineer, in the vernacular of the railroad men, referred to order No. 226 as being "inoperative and ineffective" and did not claim that the order had been displaced in his mind, or superseded by the telephone instructions of the dispatcher, or by other means, it is difficult to see how the jury could view the whole matter in any other way than that the engineer, conductor and other members of the train crew overlooked the order for the time being. Plaintiff gives some evidence tending to

show that such was the fact, in that his engine did not work well and he was bothered with it. The jury was not materially concerned with whether the plaintiff as a witness could match language with the learned cross-examiner, when the plaintiff attempted to make a technical excuse for failing to heed and obey the order; but rather the jury could with propriety take into consideration all the facts and circumstances of the case. It is true that according to the rules, in order to give Davis' train No. 231 right of track over train No. 234, the order should be in writing and signed by the dispatcher. Still the jury might well consider the instructions over the telephone together with the signal to proceed given by the conductor in determining the reason why the plaintiff failed to heed order No. 226, and in fixing the degree of plaintiff's contributory negligence. All of the facts and circumstances of the case as shown by the evidence, including the testimony of the trainmaster and the other expert witnesses for defendant, to the effect that a later or third order sent by the dispatcher to the operator at Oswego would have been an additional precaution; and the evidence that it would have been practical for the dispatcher to have sent such a middle or third order to Oswego; that order No. 226 was technically a violation of the rules in naming a station off of the line traversed by train No. 231, as it contained matter not essential to the order by naming Beaverton; and that some of the experienced railroad men as witnesses stated they had never before seen an order like it; were for the jury to consider in placing responsibility for the fault which caused the accident.

It is alleged in the complaint, as above quoted, in effect, that the defendant was negligent in not issuing and sending an order for plaintiff's train No. 221 to

meet train No. 234 at Oswego or at a definite point, or not forwarding a copy of order No. 226 to Oswego. Much is said in the record and briefs in regard to such a third or intermediate order being sent out when the order issued is a "meet or wait order." It is noticed, and the trial court called attention to the fact, that rule 208 provides that the several addresses of orders must be in the order of superiority of trains and "when practicable must include the operator at the *meeting* or *waiting point.*" (Italics ours.) It would seem to one not an expert in railroading, that the third or intermediate order when practicable was required to be sent to the operator at the meeting or waiting point of trains regardless of the form of the order or number of the blank upon which the order is written. The highest degree of care is required in directing the movement of trains.

Mr. Morris, the train-master, conveyed the impression to the trial court and jury that order No. 226 was faulty. He did not know what the idea of the dispatcher was in this case in regard to the order. The jury did not have the benefit of testimony of the dispatcher, as he was not called. Mr. Morris states that it was possible when the dispatcher first started to put out his orders he was not sure what time train No. 231 would get out of Brooklyn, and possibly that was the reason he put out order No. 226, and that if the dispatcher had known definitely as to such time he would probably have put out a meet order at some point. He then stated: "But my position is that if I was handling the trains that is the way I would do it, I would move them along until I could get them to a meeting point." Mr. Morris reluctantly admitted upon cross-examination that it would have been an additional precaution in this case to send a copy of this order No. 226 to the operator at Oswego;

that if the operator there had had such message and understood it he would not have given a "clear board" for train No. 231; that order 226 was a technical violation of rule 201. One real trouble which the jury probably noticed with the order No. 226 was that it did not inform engineer Davis or his train crew where train No. 234 was, whether it was on the line to be traversed by train No. 231 or not. It appears from the questions of the trial court that the order was somewhat confusing to the court and probably was confusing to the jury, and the jury under all the circumstances would reasonably conclude that the order was confusing and misleading to plaintiff Davis and the other members of his train crew. Mr. Dickey, the conductor on train No. 234, apparently an experienced trainman, stated in regard to order No. 226, that it would have the same effect as a meet order but that it was not a meet order, that where trains are to meet at a station such as Oswego where there is a telegraph operator the third order must go to the telegraph operator; that if the operator at Oswego had had such an order or a copy of No. 226 and understood it as this conductor did he would not have given a clear board for Mr. Davis to go from Oswego. All of this was for the consideration of the jury, with the other testimony. Mr. C. B. Baker, division examiner, testified to the effect that he never saw an order like 226 before, covering a certain piece of territory that a train was not scheduled over; that the order should have read technically "Cook to Oswego." The jury no doubt considered the fact shown in the record that the defendant by discharging Mr. Frederickson, the conductor of train No. 231, in effect said that he was at fault and negligent in the management of train No. 231 in connection with the collision. This act of the defendant spoke

louder than words. There is no question under the
law, and the jury was so instructed, that the defend-
ant was responsible for the negligent conduct of con-
ductor Frederickson.

The testimony of the train-master indicated that if
he had been handling the trains in question as a
dispatcher, he would have issued a further order
providing for a definite meeting point of the two
trains, and the jury may well have believed that such
an additional order would have been practical as
an additional precaution, and that such an order
subsequent to No. 226 should have been sent out
under the rules, and if that had been done the
collision would not have occurred. There is con-
siderable in the record and briefs in regard to the
reason why, under the circumstances, engineer Davis
left Oswego for Cook with his train on a single
track. This is perhaps the first question that would
arise in one's mind upon hearing the case. Upon
his examination the plaintiff was asked the ques-
tion plainly. It is apparent from the verdict that
the jury believed the answer that he gave. The
plaintiff was asked the question: ''Why with this
situation did you go on towards Cook?'' A. ''I
knew that having no further orders for us, concerning
us that the way was clear, and receiving the high-
ball from the conductor proceeded on my way.''

It appears that the witness has a positive up and
down way of answering questions, which may perhaps
be peculiar to trainmen, but the answer quoted un-
doubtedly meant to the jury that engineer Davis,
after he had called for the semaphore signal and
received a clear board and the sign from the con-
ductor to proceed, believed that the track was clear,
and that he did not have the contents of order No.

108 Or.—11

226 in his mind at that time or was in some way confused as to the order. The jury also evidently determined that the same was true in regard to the other members of the train crew of No. 231. It may be that the jury thought that Davis and other members of the crew felt safe in following the passenger train which had left Oswego ten minutes before train No. 231 departed.

There were six men engaged in managing the train at the time of the collision. Under the evidence the jury was warranted in finding that all were negligent, and that the negligence of the conductor, brakemen and fireman concurred in the negligence of the plaintiff and contributed to the proximate cause of the injury. In regard to the conduct of plaintiff Davis, we might well apply the language of Mr. Justice PITNEY in the case of *Spokane & Inland R. R.* v. *Campbell*, 241 U. S. 497, 508–509 (60 L. Ed. 1125, 36 Sup. Ct. Rep. 683), where it was claimed Campbell as motorman willfully violated his order in the movement of a train. We there read:

"From the fact that he disregarded and in effect violated the order as actually communicated to him it of course does not necessarily follow that he did this willfully. The jury was not bound to presume— it would hardly be reasonable to presume—that he deliberately and intentionally ran his train out upon a single track on which he knew an incoming train with superior rights was then due. However plain his mistake, the jury reasonably might find it to be no more than a mistake attributable to mental aberration, or inattention, or failure for some other reason to apprehend or comprehend the order communicated to him. In its legal effect this was nothing more than negligence on his part, and not a departure from the course of his employment.

"To hold otherwise would have startling conse-
quences. The running of trains on telegraphic orders
is an every-day occurrence on every railroad in the
country. Thousands of cases occur every day and
every night where a failure by conductor or engi-
neer to comprehend or to remember the message of
the train dispatcher may endanger the lives of em-
ployees and passengers. We are not aware that in
any case it has been seriously contended that because
an engineer violated the orders he went outside
of the scope of the employment. If he did so, in
the sense of absolving the employer from the duty
of exercising care for his safety, it is not easy to
see upon what principle the employer's liability to
passengers or to fellow employees for the conse-
quences of his negligence could be maintained. The
unsoundness of the contention is so apparent that
further discussion is unnecessary."

In *Union Pac. Ry. Co.* v. *Hadley,* 246 U. S. 330
(62 L. Ed. 751, 38 Sup. Ct. Rep. 318), the facts were
as follows: The deceased (Cradit) was a brakeman
on an east-bound freight train known as Extra 504
East. At Dix, in Nebraska, it was overtaken by
another eastbound train known as Extra 501 East.
There is a single track from Dix to Mile Post 426,
17 miles distant, and train 504 went ahead to this
latter point. Train 501 followed for about half the
distance to Potter and was held there until 504 had
reached Mile Post 426, seven miles farther on, when
501 was started on again, leaving its conductor
there. But an Extra 510 West had broken down at
Mile Post 426 and the train-dispatcher at Sidney,
about twelve miles still farther east, ordered train
504 to take the disabled engine of 510 back to Sidney.
The engineer asked the dispatcher to allow 504 to
go on and to let 501, when it came up, take back
the engine of 510, but it was refused. No. 501 came

up, ran into 504 and killed Cradit and some others. The plaintiff says that the accident was due to at least contributory negligence of the railroad. The defendant claims that it was not negligent, that Cradit would not have been killed if he had done his duty and gone back to warn the following train by lights, torpedoes, etc., instead of remaining in the caboose, as he did, and that this was the proximate cause of his death. Mr. Justice HOLMES, speaking for the court at page 332 of the opinion says:

"On the question of its negligence the defendant undertook to split up the charge into items mentioned in the declaration as constituent elements and to ask a ruling as to each. But the whole may be greater than the sum of its parts, and the Court was justified in leaving the general question to the jury if it thought that the defendant should not be allowed to take the bundle apart and break the sticks separately, and if the defendant's conduct viewed as a whole warranted a finding of neglect. * *

"But it is said that in view of the defendant's conduct the only proximate cause of Cradit's death was his own neglect of duty. But if the railroad company was negligent it was negligent at the very moment of its final act. It ran one train into another when if it had done its duty neither train would have been at that place. Its conduct was as near to the result as that of Cradit. We do not mean that the negligence of Cradit was not contributory. We must look at the situation as a practical unit rather than inquire into a purely logical priority. *But even if Cradit's negligence should be deemed the logical last, it would be emptying the statute of its meaning to say that his death did not 'result in part from the negligence of any of the employees' of the road.* Act of April 22, 1918, c. 149, § 1, 35 Stat. 65. In *Great Northern Ry. Co.* v. *Wiles,* 240 U. S. 444 (60 L. Ed. 732, 36 Sup. Ct. Rep. 406) it appeared

that the only negligence connected with the death was that of the brakeman who was killed.'' (Italics ours.)

The Wiles case is cited and relied on in the present case by defendant. In that case it was the duty of Wiles to have gone back a sufficient distance to protect the rear end of the train and flagged the coming train. The engineer, at the time the train broke in two and stopped, signaled for Wiles, the rear brakeman, to go back and so protect the train. In the present case, instead of the engineer being signaled to stop train No. 231, his instructions were the reverse, the conductor signaled him to proceed. The facts differ widely from those in the Wiles case.

In a case under the federal Employers' Liability Act the carrier is liable in damages for an injury resulting in whole or in part from its negligence. If the injury is caused in whole or in part from the defendant carrier's negligence the statute cannot be nullified and the right of recovery defeated by calling the plaintiff's act the proximate cause of the injury: 1 Roberts' Federal Liabilities of Carriers, p. 955, § 545; *Louisville & N. R. Co.* v. *Wene,* 202 Fed. 887 (121 C. C. A. 245).

In *Grand Trunk Western R. Co.* v. *Lindsay,* 201 Fed. 836 (120 C. C. A. 166), the court said:

''If under the Employers' Liability Act, plaintiff's negligence, contributing with defendant's negligence to the production of the injury, does not defeat the cause of action, but only lessens the damages, and if the cause of action is established by showing that the injury resulted 'in whole or in part' from defendant's negligence, the statute would be nullified by calling plaintiff's act the proximate cause, and then defeating him, when he could not be defeated by calling his act contributory negligence. For his act was the same act, by whatever name it be called.

It was only when plaintiff's act is the sole cause—
when defendant's act is no part of the causation—
that defendant is free from liability under the act."
1 Roberts' Federal Liabilities of Carriers, note p. 956.

The defendant contends in effect that the responsi-
bility for the movement of train No. 231 rested upon
the engineer, and that the conductor, brakemen and
firemen were not equally accountable for the proper
management of the train with the engineer. Defend-
ant excepted to the instruction of the court in this
regard. A reading of the rules above set out we
think plainly indicates that the whole train crew is
equally responsible for a careful construction of, and
strict obedience to the rules and regulations adopted
and promulgated for safety in the management of the
trains of defendant, to the end that the safety of the
employees and the traveling public may be preserved
to the fullest extent consistent with the highest de-
gree of care. "The duty of obedience to the rules of
the employer is one resting alike upon all employees,"
as said by Mr. Justice BREWER in *Atchison, T. & S. F.
R. Co.* v. *Reesman,* 60 Fed. 370, 378 (9 C. C. A. 20, 23
L. R. A. 768). In *Southern Ry. Co.* v. *Mays,* 239 Fed.
41 (152 C. C. A. 91, at p. 94), we find this language:
"The duty of moving the train, as we have stated,
likewise devolved upon the train crew, under the direc-
tion of the conductor."

The jury was not compelled to find from the evi-
dence, as contended by defendant, that the act of the
plaintiff in leaving Oswego was a suicidal one. From
the evidence the court cannot say as a matter of law
that this act of plaintiff was intentional. Where two
inferences may legitimately be drawn from the facts
in evidence, one favorable to plaintiff and the other
to the contrary, a question is presented which is for

the jury to determine. It is proper for the jury to look at the situation as a practical unit when the question is submitted to it, if the defendant is negligent: *Gekas* v. *O.-W. R. & N. Co.,* 75 Or. 243, 252 (146 Pac. 970, 8 N. C. C. A. 386); *Geldard* v. *Marshall,* 43 Or. 438, 444 (73 Pac. 330); *Galvin* v. *Brown,* 53 Or. 598, 608 (101 Pac. 671); *Kopacin* v. *Crown-Columbia Pulp & Paper Co.,* 62 Or. 291, 296 (125 Pac. 281); *Union Pac. R. Co.* v. *Hadley,* 246 U. S. 330 (62 L. Ed. 751, 38 Sup. Ct. Rep. 318); *Chadwick* v. *O.-W. R. & N. Co.,* 74 Or. 19 (144 Pac. 1165); *Illinois Cent. R. Co.* v. *Skaggs,* 240 U. S. 66 (60 L. Ed. 528, 36 Sup. Ct. Rep. 249, see, also, Rose's U. S. Notes).

The defendant insists that a verdict in defendant's favor should have been directed, for the reason that there is no sufficient evidence that plaintiff was engaged in interstate commerce at the time of the injury. The testimony clearly shows, and we understand it is conceded, that at the time of the accident and for a long time prior thereto the defendant was engaged in interstate commerce. The plaintiff Davis testified without objection on the part of counsel for defendant to the effect that one of the cars of the train he was hauling with the engine on the day of the accident, the car next to the engine, was a Pere Marquette or a Burlington & Quincy, which was a foreign car and differed from the cars belonging to the system of the defendant, and was loaded with freight, merchandise, etc., for distribution along the line of road; that the freight originated in a state other than the State of Oregon. Upon cross-examination plaintiff stated that the reason he knew the shipment came from some other state was that he saw the record of the defendant kept by its agent called an O. S. D. report; whereupon counsel for defendant

moved to strike out the testimony as to what the car
contained on the ground that the record referred to
by the witness was the best evidence of its contents.
The trial court ruled that timely objection had not
been made to the testimony; that the defendant should
have assumed at the time the witness answered the
question that the only information he could have had
about the shipment of freight was from the records.

If there was any error in regard to the statement
made by the witness Davis in his own behalf, it was
within the knowledge of the defendant, and the way-
bills, reports and records of the defendant could have
been easily obtained and presented to the court and
jury to correct the error. The plaintiff's testimony
was in no way contradicted. It tended to show that
the cars in train No. 231 which plaintiff was assisting
in operating were not loaded at Brooklyn, where the
train was made up.

As a matter of fact in the practical operation of
railroads, trains running between two terminals, con-
taining only intrastate commerce or traffic originat-
ing in and being destined to a point in the same state
are seldom operated. As a rule every train carries
interstate freight. If a train has a single shipment
of interstate freight, then all the employees working
on that train are engaged in interstate commerce:
1 Roberts' Federal Liabilities of Carriers, p. 857,
§ 496.

Even though the evidence was open to the objection
of not being the best evidence, it should not after-
wards be excluded, as the objection was not made at
the proper time: 2 Jones on Evidence, p. 187, § 202.
It is there stated in part:

"If the opponent is deceived and does not know he
is deceived, or if he is lax and permits secondary evi-

dence to be given when he might have insisted upon the primary evidence or none at all, belongs scarcely to the realm of evidence. As it does undoubtedly exist, we treat it, and find it laid down, that the rule excluding secondary evidence, when that which is primary is attainable, is not so rigid as to be enforced if no objection is made by the party against whom the inferior evidence is offered. It frequently happens that secondary evidence is admitted, and thus becomes primary, when it might have been excluded if proper objection had been taken. The courts pronounce themselves very clearly on the subject."

In *Colgan* v. *Farmers & Mechanics' Bank,* 59 Or. 469, 476 (114 Pac. 460), the court said:

"In the trial of an action a party has an opportunity to object to anything occurring within his knowledge that may be regarded as prejudicial, and he can, upon calling the court's attention to the matter, secure a ruling which, if adverse and excepted to, may be reviewed on appeal. A party having a suitable occasion to object and except to anything considered detrimental to his interests must take advantage of the harmful act or conduct when it occurs, if he has knowledge thereof, for he will not be permitted to speculate on a favorable verdict, and if disappointed, then seek to question the proceedings by a motion for a new trial."

Under all the circumstances we think the court properly overruled the motion to strike.

In addition to the interstate shipment contained in one of the foreign cars the testimony of the plaintiff tended to show that the train contained a carload of railroad ties which they were taking to be distributed along the railroad for immediate use where a section crew was then engaged in repairing the roadbed and using the ties for that purpose. There was an effort made on the part of defendant to show that these ties were to be piled for the purpose of drying

them, and were not to be used immediately, but this failed. The testimony indicated that there was immediate use for the ties, that it was an every-day occurrence for the crew of train No. 231 to scatter the ties along the road for such use, and that this carload of ties was to be delivered along the track and used.

In the early decisions under the federal act the view was taken in some cases that an employee engaged in repairing the track was not engaged in interstate commerce, although interstate trains passed over the track. In some of these cases the court attempts to draw a distinction between "preparing to engage" and "engaging" in interstate commerce. Any such supposed distinction is swept away by the Supreme Court of the United States in the case of *Pedersen* v. *Delaware, L. & W. R. Co.*, 229 U. S. 146 (Ann. Cas. 1914C, 153, 57 L. Ed. 1125, 33 Sup. Ct. Rep. 651), reversing 184 Fed. 737, and 197 Fed. 537, 117 C. C. A. 33. It was held in this recent decision that an employee engaged in carrying a sack of bolts or rivets to be used in repairing a bridge regularly in use in interstate as well as intrastate commerce, was engaged in interstate commerce. See note to *Lamphere* v. *Oregon R. & Nav. Co.*, 47 L. R. A. (N. S.), pp. 55, 56. In the Pedersen case the court said:

"That the defendant was engaged in interstate commerce is conceded, and so we are only concerned with the nature of the work in which the plaintiff was employed at the time of his injury. Among the questions which naturally arise in this connection are these: Was that work being done independently of the interstate commerce in which the defendant was engaged, or was it so closely connected therewith as to be a part of it? Was its performance a matter of indifference so far as that commerce was concerned, or was it in the nature of a duty resting upon the

carrier? The answers are obvious. Tracks and bridges are as indispensable to interstate commerce by railroad as are engines and cars; and sound economic reasons unite with settled rules of law in demanding that all of these instrumentalities be kept in repair. The security, expedition and efficiency of the commerce depends in large measure upon this being done. Indeed, the statute now before us proceeds upon the theory that the carrier is charged with the duty of exercising appropriate care to prevent or correct 'any defect or insufficiency * * in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment' used in interstate commerce. But independently of the statute, we are of opinion that the work of keeping such instrumentalities in a proper state of repair while thus used is so closely related to such commerce as to be in practice and legal contemplation a part of it. The contention to the contrary proceeds upon the assumption that interstate commerce by railroad can be separated into its several elements and the nature of each determined regardless of its relation to others or to the business as a whole. But this is an erroneous assumption. The true test always is: Is the work in question a part of the interstate commerce in which the carrier is engaged? (Citing authorities.) Of course, we are not here concerned with the construction of tracks, bridges, engines or cars which have not as yet become instrumentalities in such commerce, but only with the work of maintaining them in proper condition after they have become such instrumentalities, and during their use as such. True, a track or bridge may be used in both interstate and intrastate commerce, but when it is so used it is none the less an instrumentality of the former; nor does its double use prevent the employment of those who are engaged in its repair or in keeping it in suitable condition for use from being an employment in interstate commerce. The point is made that the plaintiff was not, at the time of his injury, engaged in removing the old girder and insert-

ing the new one, but was merely carrying to the place where that work was to be done some of the materials to be used therein. We think there is no merit in this. It was necessary to the repair of the bridge that the materials be at hand, and the act of taking them there was a part of that work. In other words, it was a minor task which was essentially a part of the larger one, as is the case when an engineer takes his engine from the roundhouse to the track on which are the cars he is to haul in interstate commerce." Citing authorities.

So in regard to the transportation of the ties in the present case, it was essential that the track be repaired. In order to do this it was necessary that the ties be at hand, using the language of the United States Supreme Court, "and the act of taking them there was a part of that work."

It is held that a section-hand engaged in repairing the track over which interstate traffic is carried is likewise employed in interstate commerce: *Southern Ry. Co.* v. *Howerton* (Ind. App.), 101 N. E. 121. Also an employee of an interstate railroad engaged in the repair of a bridge on such railroad is employed in interstate commerce: *Thompson* v. *Columbia & P. S. R. Co.*, 205 Fed. 203. A railroad trackman injured while repairing a switch in the yards of the railroad company over which both interstate and intrastate commerce was transported comes within the statute: *Colasurdo* v. *Cent. R. Co.*, 180 Fed. 832, affirmed in 192 Fed. 901 (113 C. C. A. 379).

In *Barlow* v. *Lehigh Valley R. Co.*, 158 App. Div. 768 (143 N. Y. Supp. 1053), it was held that an engineer engaged in switching cars loaded with coal to be used by defendant's engines in both interstate and intrastate transportation was within the protection of the statute: Note to *Lamphere* v. *O.-W. R. & N.*

*Co.,* 47 L. R. A. (N. S.) 58. In *Horton* v. *O.-W. R. & N. Co.,* 72 Wash. 503 (130 Pac. 897, 47 L. R. A. (N. S.), p. 8), the syllabus reads:

"An operator of a railroad pumping plant which furnished water for interstate and intrastate engines is employed in interstate commerce while riding from his home to his work on a hand-car furnished by the company for that purpose, so as to be within the operation of the Federal Employers' Liability Act if injured by those, during that time, in charge of an interstate train."

See *Montgomery* v. *S. P. Co.,* 64 Or. 597 (131 Pac. 507, 47 L. R. A. (N. S.) 13, 9 N. C. C. A., p. 12, note).

In the present case the testimony, to the effect that the train in question was carrying an interstate shipment of freight and ties for immediate use in repairing an interstate track, is uncontradicted and evidently could not be disputed.

As we understand the authorities, many of which are cited in behalf of defendant, where material for repairing an interstate track is in process of being manufactured for use some time in the future, or where material is being stored which may be used in the future to promote interstate commerce, or where such material is being removed from one place of storage to another for possible future use in interstate commerce or repairing an interstate track, the use is too remote or problematical and the employee engaged in such work is not held to be engaged in interstate commerce: See *Alexander* v. *Great N. Ry. Co.,* 51 Mont. 565 (154 Pac. 914, L. R. A. 1918E, 852); *Chicago, B. & Q. R. R. Co.* v. *Harrington,* 241 U. S. 177 (60 L. Ed. 941, 36 Sup. Ct. Rep. 517, 11 N. C. C. A. 992); *Lehigh Valley R. R. Co.* v. *Barlow,* 244 U. S. 183 (61 L. Ed. 1070, 37 Sup. Ct. Rep. 515).

As the jury was instructed by the trial court in the present case, the burden of proof rests upon the plaintiff to show that at the time of the injury he was employed in interstate commerce and that the carrier was also engaged in such commerce: 1 Roberts' Federal Liabilities of Carriers, p. 811; *Second Employers' Liability Cases,* 223 U. S. 1, 48–52 (56 L. Ed. 27, 38 L. R. A. (N. S.) 44, 32 Sup. Ct. Rep. 169, see, also, Rose's U. S. Notes).

The testimony herein was sufficient to sustain the burden resting upon the plaintiff in the respect mentioned, and to take the case to the jury upon this point. A request for an instructed verdict should not be granted where reasonable minds may draw different conclusions from the testimony before the jury, or where the evidence is conflicting: *Stager* v. *Troy Laundry Co.,* 41 Or. 141 (68 Pac. 405); *Sullivan* v. *Wakefield,* 59 Or. 401 (117 Pac. 311); *Domurat* v. *O.-W. R. & N. Co.,* 66 Or. 135, 143 (134 Pac. 313). There was no error in the refusal of the trial court to direct a verdict for defendant.

Most of the questions involved in the exceptions to the instructions to the jury and the instructions requested by defendant and refused by the court, which present defendant's theory of the assignments of error, are covered in the matters pertaining to the request for a directed verdict. As to any further objections to the charge, a portion of which we have quoted, we have carefully examined the charge in its entirety and believe the case was very carefully and fairly submitted to the jury by the learned trial judge. We approve the instructions. They were in accordance with the letter and spirit of the federal act. The charge covers all of the instructions requested by the

defendant necessary properly to present the issues to the jury.

Defendant predicates error upon the refusal of the trial court to grant defendant a new trial. The main ground of the motion, as shown by affidavits, save as to questions of law to which we have referred, is that after the trial of the cause the books of plaintiff pertaining to a garage were inspected, and plaintiff claimed he had been making a net profit in the garage business greater than that mentioned in his testimony upon the trial. Conflicting affidavits were filed. Plaintiff alleged in his complaint that at the time of his injury he was earning, and capable of earning, as engineer $300 per month; that by reason of his injuries he had been wholly incapacitated from performing work of the kind and character he formerly performed or to do any manual labor. His testimony tended to show that, not being able to pursue his usual vocation, he purchased a garage in Berkeley, California, and conducted the business, but was compelled on account of his physical condition to hire the mechanical work done. It is apparent that whatever profit he has made or will make in the garage business was, and is largely speculative like any other business in which he might engage. The plaintiff's injuries and damages were practically unquestioned by defendant at the trial. They were in issue at the trial, and we see no good reason why the defendant could not have obtained the information in regard to plaintiff's financial transactions relating to the garage business before the trial. In any event, we do not think the trial court, upon a motion for a new trial, was required to determine whether the plaintiff made a statement "puffing" his business. There was no error in denying the motion for a new trial.

As to the instruction of the trial court which the opinion of two of my associates, Mr. Justice Brown and Mr. Justice Harris, holds to be erroneous, I think as indicated by their opinion, it is largely favorable to the defendant. The defendant makes a formal assignment of error as to the instruction, to the effect that the conductor, fireman and brakemen on train No. 231 ''were each equally with the plaintiff responsible for the operation of said train''; yet the complaint of the defendant, as we understand the brief of counsel, taking the language from page 9 referring to the train order No. 226, is that ''the error in the ruling inheres in the fact that it does not reach sufficiently far. Instead of treating Davis' inexplicable conduct as 'negligent' it ought to have been classified in the domain of willful recklessnes.'' It seems the word ''equal'' as used in the instruction quoted above, is used in the sense of ''likewise'' and did not convey to the jury the meaning that each of the members of the train crew was responsible in the same degree or to the same extent. The word as used may not be strictly apt. It was not a reversible error.

It might be further said, in regard to the gist of the instruction referred to, that Rule 201 provides in part: ''For movement not provided for by time-table, train orders will be issued by authority and over the signature of the Superintendent.'' Unquestionably order No. 226 was issued pursuant to the rules of the company. A violation of that order was a violation of the rules of the company. The only difference is a matter of expression. At page 151 of the transcript of evidence we find that the defendant requested the court to instruct the jury as follows:

''I instruct you that the defendant not only had the right, but it was its duty to promulgate rules gov-

erning the operation of its trains. These rules, in so far as they apply to this case, have been introduced in evidence, and they are binding on the parties to this case. A violation of these rules by either party is negligence.''

It is not claimed, and cannot be claimed, that the defendant is not responsible for the act of its agents or employees. The conductor, fireman and brakemen on train No. 231 must be classed among such employees, so that it clearly appears that the defendant requested the substance of the instruction referring to the conductor, brakemen and fireman. It is a well-settled rule that a party cannot complain of an instruction of the court that has been requested by such party. If the instruction was erroneous in the respect suggested by my associates, the error was invited by the defendant. The instruction was in substance a proper one, except that it was unfavorable to plaintiff.

The main difference between the contention of plaintiff and defendant, and the material difference between the opinion of the writer and his associates, relates to a question of fact involving the construction of the testimony in the case, which is a proper question for the jury, and was fairly submitted to that tribunal. It is true that from a portion of plaintiff's testimony a different deduction might have been drawn than that which was made by the jury. As the writer views the matter this was purely a question for the jury, and not one of law for the court. How the court could instruct the jury that the plaintiff was at fault in failing to heed order No. 226, as contended by defendant, and at the same time hold the conductor and other members of the crew blameless for a similar act, is beyond the comprehension of the writer. The rules of the railroad plainly provide

for a scheme in which all of the train crew engaged in the operation of a train should exercise the highest degree of care in so managing the train, and each is entitled to rely upon the others for assistance, and it is the duty of each to call attention to the other members of the crew, in case of necessity, to any oversight or infringement of the rules. This plan necessitates having so many men engaged in the operation of a train.

For the foregoing reasons I am unable to concur in the opinions of my associates. The judgment of the Circuit Court should be affirmed.